**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE HYUNDAI AND KIA FUEL
ECONOMY LITIGATION,

---

KEHLIE R. ESPINOSA; NICOLE MARIE
HUNTER; JEREMY WILTON;
KAYLENE P. BRADY; GUNTHER
KRAUTH; ERIC GRAEWINGHOLT;
REECE PHILIP THOMSON; ALEX
MATURANI; NILUFAR REZAI; JACK
ROTTNER; LYDIA KIEVIT; REBECCA
SANDERS; BOBBY BRANDON
ARMSTRONG; SERGIO TORRES;
RICHARD WOODRUFF; MARSHALL
LAWRENCE GORDON; JOEL A.
LIPMAN; JAMES GUDGALIS; MARY P.
HOESSLER; STEPHEN M. HAYES;
BRIAN REEVES; SAM HAMMOND;
MARK LEGGETT; EDWIN NAYTHONS;
MICHAEL WASHBURN; IRA D.
DUNST; BRIAN WEBER; KAMNEEL
MAHARAJ; KIM IOCOVOZZI;
HERBERT J. YOUNG; LINDA HASPER;
LESLIE BAYARD; TRICIA FELLERS;
ORLANDO ELLIOTT; JAMES
BONSIGNORE; MARGARET SETSER;
GUILLERMO QUIROZ; DOUGLAS
KURASH; ANDRES CARULLO; LAURA
S. SUTTA; GEORGIA L. THOMAS;

No. 15-56014

D.C. No.
2:13-ml-02424-
GW-FFM

ERIC J. OLSON; JENNIFER MYERS; TOM WOODWARD; JEROLD TERHOST; CAMERON JOHN CESTARO; DONALD BROWN; MARIA FIGUEROA; CONSTANCE MARTYN; THOMAS GANIM; DANIEL BALDESCHI; LILLIAN E. LEVOFF; GIUSEPPINA ROBERTO; ROBERT TRADER; SEAN GOLDSBERRY; CYNTHIA NAVARRO; OWEN CHAPMAN; MICHAEL BREIN; TRAVIS BRISSEY; RONALD BURKARD; ADAM CLOUTIER; STEVEN CRAIG; JOHN J. DIXSON; ERIN L. FANTHORPE; ERIC HADESH; MICHAEL P. KEETH; JOHN KIRK MACDONALD; MICHAEL MANDAHL; NICHOLAS MCDANIEL; MARY J. MORAN-SPICUZZA; GARY PINCAS; BRANDON POTTER; THOMAS PURDY; ROCCO RENGHINI; MICHELLE SINGLTEON; KEN SMILEY; GREGORY M. SONSTEIN; ROMAN STARNO; GAYLE A. STEPHENSON; ANDRES VILLICANA; RICHARD WILLIAMS; BRADFORD L. HIRSCH; ASHLEY CEPHAS; DAVID E. HILL; CHAD MCKINNEY; MORDECHAI SCHIFFER; LISA SANDS; DONALD KENDIG; KEVIN GOBEL; ERIC LARSON; LIN MCKINNEY; RYAN CROSS; PHILLIP HOFFMAN; DEBRA SIMMONS; ABELARDO MORALES; PETER BLUMER; CAROLYN HAMMOND;

MELISSA LEGGETT; KELLY MOFFETT; EVAN GROGAN; CARLOS MEDINA; ALBERTO DOMINGUEZ; CATHERINE BERNARD; MICHAEL BREIEN; LAURA GILL; THOMAS SCHILLE; JUDITH STANTON; RANDY RICKERT; BRYAN ZIRKEL; JAMES KUNDRAT; ROBERT SMITH; MARIA KOTOVA; JOSIPA CASEY; LUAN SNYDER; BEN BAKER; BRIAN NGUYEN; HATTIE WILLIAMS; BILL HOLVEY; LOURDES VARGAS; KENDALL SNYDER; NOMER MEDINA; SAMERIA GOFF; URSULA PYLAND; MARCELL CHAPMAN; KAYE KURASH; HOLLY AMROMIN; JOHN CHAPMAN; MARY D'ANGELO; GEORGE RUDY; AYMAN MOUSA; SHELLY HENDERSON; JEFFREY HATHAWAY; DENNIS J. MURPHY; DOUGLAS A. PATTERSON; JOHN GENTRY; LINDA RUTH SCOTT; DANIELLE KAY GILLELAND; JOSEPH BOWE; MICHAEL DESOUTO,
*Plaintiffs-Appellees*,

GREG DIRENZO,
*Petitioner-Appellee*,

HYUNDAI MOTOR AMERICA; KIA MOTORS AMERICA; KIA MOTORS CORPORATION; GROSSINGER AUTOPLEX, INC., FKA Grossinger

Hyundai; JOHN KRAFCIK; HYUNDAI
MOTOR COMPANY; SARAH
KUNDRAT,
        *Defendants-Appellees*,

v.

CAITLIN AHEARN; ANDREW YORK,
        *Objectors-Appellants*.

IN RE HYUNDAI AND KIA FUEL
ECONOMY LITIGATION,

KEHLIE R. ESPINOSA; NICOLE MARIE
HUNTER; JEREMY WILTON;
KAYLENE P. BRADY; GUNTHER
KRAUTH; ERIC GRAEWINGHOLT;
REECE PHILIP THOMSON; ALEX
MATURANI; NILUFAR REZAI; JACK
ROTTNER; LYDIA KIEVIT; REBECCA
SANDERS; BOBBY BRANDON
ARMSTRONG; SERGIO TORRES;
RICHARD WOODRUFF; MARSHALL
LAWRENCE GORDON; JOEL A.
LIPMAN; JAMES GUDGALIS; MARY P.
HOESSLER; STEPHEN M. HAYES;
BRIAN REEVES; SAM HAMMOND;
MARK LEGGETT; EDWIN NAYTHONS;
MICHAEL WASHBURN; IRA D.
DUNST; BRIAN WEBER; KAMNEEL
MAHARAJ; KIM IOCOVOZZI;

No. 15-56025

D.C. No.
2:13-ml-02424-
GW-FFM

HERBERT J. YOUNG; LINDA HASPER; LESLIE BAYARD; TRICIA FELLERS; ORLANDO ELLIOTT; JAMES BONSIGNORE; MARGARET SETSER; GUILLERMO QUIROZ; DOUGLAS KURASH; ANDRES CARULLO; LAURA S. SUTTA; GEORGIA L. THOMAS; ERIC J. OLSON; JENNIFER MYERS; TOM WOODWARD; JEROLD TERHOST; CAMERON JOHN CESTARO; DONALD BROWN; MARIA FIGUEROA; CONSTANCE MARTYN; THOMAS GANIM; DANIEL BALDESCHI; LILLIAN E. LEVOFF; GIUSEPPINA ROBERTO; ROBERT TRADER; SEAN GOLDSBERRY; CYNTHIA NAVARRO; OWEN CHAPMAN; MICHAEL BREIN; TRAVIS BRISSEY; RONALD BURKARD; ADAM CLOUTIER; STEVEN CRAIG; JOHN J. DIXSON; ERIN L. FANTHORPE; ERIC HADESH; MICHAEL P. KEETH; JOHN KIRK MACDONALD; MICHAEL MANDAHL; NICHOLAS MCDANIEL; MARY J. MORAN-SPICUZZA; GARY PINCAS; BRANDON POTTER; THOMAS PURDY; ROCCO RENGHINI; MICHELLE SINGLTEON; KEN SMILEY; GREGORY M. SONSTEIN; ROMAN STARNO; GAYLE A. STEPHENSON; ANDRES VILLICANA; RICHARD WILLIAMS; BRADFORD L. HIRSCH; ASHLEY CEPHAS; DAVID E. HILL; CHAD

MCKINNEY; MORDECHAI SCHIFFER;
LISA SANDS; DONALD KENDIG;
KEVIN GOBEL; ERIC LARSON; LIN
MCKINNEY; RYAN CROSS; PHILLIP
HOFFMAN; DEBRA SIMMONS;
ABELARDO MORALES; PETER
BLUMER; CAROLYN HAMMOND;
MELISSA LEGGETT; KELLY
MOFFETT; EVAN GROGAN; CARLOS
MEDINA; ALBERTO DOMINGUEZ;
CATHERINE BERNARD; MICHAEL
BREIEN; LAURA GILL; THOMAS
SCHILLE; JUDITH STANTON; RANDY
RICKERT; BRYAN ZIRKEL; JAMES
KUNDRAT; ROBERT SMITH; MARIA
KOTOVA; JOSIPA CASEY; LUAN
SNYDER; BEN BAKER; BRIAN
NGUYEN; HATTIE WILLIAMS; BILL
HOLVEY; LOURDES VARGAS;
KENDALL SNYDER; NOMER MEDINA;
SAMERIA GOFF; URSULA PYLAND;
MARCELL CHAPMAN; KAYE
KURASH; HOLLY AMROMIN; JOHN
CHAPMAN; MARY D'ANGELO;
GEORGE RUDY; AYMAN MOUSA;
SHELLY HENDERSON; JEFFREY
HATHAWAY; DENNIS J. MURPHY;
DOUGLAS A. PATTERSON; JOHN
GENTRY; LINDA RUTH SCOTT;
DANIELLE KAY GILLELAND; JOSEPH
BOWE; MICHAEL DESOUTO,

*Plaintiffs-Appellees*,

GREG DIRENZO,
        *Petitioner-Appellee*,

HYUNDAI MOTOR AMERICA; KIA
MOTORS AMERICA; KIA MOTORS
CORPORATION; GROSSINGER
AUTOPLEX, INC., FKA Grossinger
Hyundai; JOHN KRAFCIK; HYUNDAI
MOTOR COMPANY; SARAH
KUNDRAT,
        *Defendants-Appellees*,

v.

ANTONIO SBERNA,
        *Objector-Appellant*.

---

IN RE HYUNDAI AND KIA FUEL
ECONOMY LITIGATION,

---

KEHLIE R. ESPINOSA; NICOLE MARIE
HUNTER; JEREMY WILTON;
KAYLENE P. BRADY; GUNTHER
KRAUTH; ERIC GRAEWINGHOLT;
REECE PHILIP THOMSON; ALEX
MATURANI; NILUFAR REZAI; JACK
ROTTNER; LYDIA KIEVIT; REBECCA
SANDERS; BOBBY BRANDON
ARMSTRONG; SERGIO TORRES;
RICHARD WOODRUFF; MARSHALL

No. 15-56059

D.C. No.
2:13-ml-02424-
GW-FFM

LAWRENCE GORDON; JOEL A.
LIPMAN; JAMES GUDGALIS; MARY P.
HOESSLER; STEPHEN M. HAYES;
BRIAN REEVES; SAM HAMMOND;
MARK LEGGETT; EDWIN NAYTHONS;
MICHAEL WASHBURN; IRA D.
DUNST; BRIAN WEBER; KAMNEEL
MAHARAJ; KIM IOCOVOZZI;
HERBERT J. YOUNG; LINDA HASPER;
LESLIE BAYARD; TRICIA FELLERS;
ORLANDO ELLIOTT; JAMES
BONSIGNORE; MARGARET SETSER;
GUILLERMO QUIROZ; DOUGLAS
KURASH; ANDRES CARULLO; LAURA
S. SUTTA; GEORGIA L. THOMAS;
ERIC J. OLSON; JENNIFER MYERS;
TOM WOODWARD; JEROLD
TERHOST; CAMERON JOHN CESTARO;
DONALD BROWN; MARIA FIGUEROA;
CONSTANCE MARTYN; THOMAS
GANIM; DANIEL BALDESCHI;
LILLIAN E. LEVOFF; GIUSEPPINA
ROBERTO; ROBERT TRADER; SEAN
GOLDSBERRY; CYNTHIA NAVARRO;
OWEN CHAPMAN; MICHAEL BREIN;
TRAVIS BRISSEY; RONALD
BURKARD; ADAM CLOUTIER;
STEVEN CRAIG; JOHN J. DIXSON;
ERIN L. FANTHORPE; ERIC HADESH;
MICHAEL P. KEETH; JOHN KIRK
MACDONALD; MICHAEL MANDAHL;
NICHOLAS MCDANIEL; MARY J.
MORAN-SPICUZZA; GARY PINCAS;

BRANDON POTTER; THOMAS PURDY; ROCCO RENGHINI; MICHELLE SINGLTEON; KEN SMILEY; GREGORY M. SONSTEIN; ROMAN STARNO; GAYLE A. STEPHENSON; ANDRES VILLICANA; RICHARD WILLIAMS; BRADFORD L. HIRSCH; ASHLEY CEPHAS; DAVID E. HILL; CHAD MCKINNEY; MORDECHAI SCHIFFER; LISA SANDS; DONALD KENDIG; KEVIN GOBEL; ERIC LARSON; LIN MCKINNEY; RYAN CROSS; PHILLIP HOFFMAN; DEBRA SIMMONS; ABELARDO MORALES; PETER BLUMER; CAROLYN HAMMOND; MELISSA LEGGETT; KELLY MOFFETT; EVAN GROGAN; CARLOS MEDINA; ALBERTO DOMINGUEZ; CATHERINE BERNARD; MICHAEL BREIEN; LAURA GILL; THOMAS SCHILLE; JUDITH STANTON; RANDY RICKERT; BRYAN ZIRKEL; JAMES KUNDRAT; ROBERT SMITH; MARIA KOTOVA; JOSIPA CASEY; LUAN SNYDER; BEN BAKER; BRIAN NGUYEN; HATTIE WILLIAMS; BILL HOLVEY; LOURDES VARGAS; KENDALL SNYDER; NOMER MEDINA; SAMERIA GOFF; URSULA PYLAND; MARCELL CHAPMAN; KAYE KURASH; HOLLY AMROMIN; JOHN CHAPMAN; MARY D'ANGELO; GEORGE RUDY; AYMAN MOUSA;

SHELLY HENDERSON; JEFFREY
HATHAWAY; DENNIS J. MURPHY;
DOUGLAS A. PATTERSON; JOHN
GENTRY; LINDA RUTH SCOTT;
DANIELLE KAY GILLELAND; JOSEPH
BOWE; MICHAEL DESOUTO,
        *Plaintiffs-Appellees*,

GREG DIRENZO,
        *Petitioner-Appellee*,

HYUNDAI MOTOR AMERICA; KIA
MOTORS AMERICA; KIA MOTORS
CORPORATION; GROSSINGER
AUTOPLEX, INC., FKA Grossinger
Hyundai; JOHN KRAFCIK; HYUNDAI
MOTOR COMPANY; SARAH
KUNDRAT,
        *Defendants-Appellees*,

v.

PERI FETSCH,
        *Objector-Appellant.*

---

IN RE HYUNDAI AND KIA FUEL
ECONOMY LITIGATION,

KEHLIE R. ESPINOSA; NICOLE MARIE
HUNTER; JEREMY WILTON;
KAYLENE P. BRADY; GUNTHER

No. 15-56061

D.C. No.
2:13-ml-02424-
GW-FFM

KRAUTH; ERIC GRAEWINGHOLT;
REECE PHILIP THOMSON; ALEX
MATURANI; NILUFAR REZAI; JACK
ROTTNER; LYDIA KIEVIT; REBECCA
SANDERS; BOBBY BRANDON
ARMSTRONG; SERGIO TORRES;
RICHARD WOODRUFF; MARSHALL
LAWRENCE GORDON; JOEL A.
LIPMAN; JAMES GUDGALIS; MARY P.
HOESSLER; STEPHEN M. HAYES;
BRIAN REEVES; SAM HAMMOND;
MARK LEGGETT; EDWIN NAYTHONS;
MICHAEL WASHBURN; IRA D.
DUNST; BRIAN WEBER; KAMNEEL
MAHARAJ; KIM IOCOVOZZI;
HERBERT J. YOUNG; LINDA HASPER;
LESLIE BAYARD; TRICIA FELLERS;
ORLANDO ELLIOTT; JAMES
BONSIGNORE; MARGARET SETSER;
GUILLERMO QUIROZ; DOUGLAS
KURASH; ANDRES CARULLO; LAURA
S. SUTTA; GEORGIA L. THOMAS;
ERIC J. OLSON; JENNIFER MYERS;
TOM WOODWARD; JEROLD
TERHOST; CAMERON JOHN CESTARO;
DONALD BROWN; MARIA FIGUEROA;
CONSTANCE MARTYN; THOMAS
GANIM; DANIEL BALDESCHI;
LILLIAN E. LEVOFF; GIUSEPPINA
ROBERTO; ROBERT TRADER; SEAN
GOLDSBERRY; CYNTHIA NAVARRO;
OWEN CHAPMAN; MICHAEL BREIN;
TRAVIS BRISSEY; RONALD

BURKARD; ADAM CLOUTIER;
STEVEN CRAIG; JOHN J. DIXSON;
ERIN L. FANTHORPE; ERIC HADESH;
MICHAEL P. KEETH; JOHN KIRK
MACDONALD; MICHAEL MANDAHL;
NICHOLAS MCDANIEL; MARY J.
MORAN-SPICUZZA; GARY PINCAS;
BRANDON POTTER; THOMAS PURDY;
ROCCO RENGHINI; MICHELLE
SINGLTEON; KEN SMILEY; GREGORY
M. SONSTEIN; ROMAN STARNO;
GAYLE A. STEPHENSON; ANDRES
VILLICANA; RICHARD WILLIAMS;
BRADFORD L. HIRSCH; ASHLEY
CEPHAS; DAVID E. HILL; CHAD
MCKINNEY; MORDECHAI SCHIFFER;
LISA SANDS; DONALD KENDIG;
KEVIN GOBEL; ERIC LARSON; LIN
MCKINNEY; RYAN CROSS; PHILLIP
HOFFMAN; DEBRA SIMMONS;
ABELARDO MORALES; PETER
BLUMER; CAROLYN HAMMOND;
MELISSA LEGGETT; KELLY
MOFFETT; EVAN GROGAN; CARLOS
MEDINA; ALBERTO DOMINGUEZ;
CATHERINE BERNARD; MICHAEL
BREIEN; LAURA GILL; THOMAS
SCHILLE; JUDITH STANTON; RANDY
RICKERT; BRYAN ZIRKEL; JAMES
KUNDRAT; ROBERT SMITH; MARIA
KOTOVA; JOSIPA CASEY; LUAN
SNYDER; BEN BAKER; BRIAN
NGUYEN; HATTIE WILLIAMS; BILL

HOLVEY; LOURDES VARGAS; KENDALL SNYDER; NOMER MEDINA; SAMERIA GOFF; URSULA PYLAND; MARCELL CHAPMAN; KAYE KURASH; HOLLY AMROMIN; JOHN CHAPMAN; MARY D'ANGELO; GEORGE RUDY; AYMAN MOUSA; SHELLY HENDERSON; JEFFREY HATHAWAY; DENNIS J. MURPHY; DOUGLAS A. PATTERSON; JOHN GENTRY; LINDA RUTH SCOTT; DANIELLE KAY GILLELAND; JOSEPH BOWE; MICHAEL DESOUTO,
*Plaintiffs-Appellees*,

GREG DIRENZO,
*Petitioner-Appellee*,

HYUNDAI MOTOR AMERICA; KIA MOTORS AMERICA; KIA MOTORS CORPORATION; GROSSINGER AUTOPLEX, INC., FKA Grossinger Hyundai; JOHN KRAFCIK; HYUNDAI MOTOR COMPANY; SARAH KUNDRAT,
*Defendants-Appellees*,

v.

DANA ROLAND,
*Objector-Appellant.*

IN RE HYUNDAI AND KIA FUEL
ECONOMY LITIGATION,

KEHLIE R. ESPINOSA; NICOLE MARIE
HUNTER; JEREMY WILTON;
KAYLENE P. BRADY; GUNTHER
KRAUTH; ERIC GRAEWINGHOLT;
REECE PHILIP THOMSON; ALEX
MATURANI; NILUFAR REZAI; JACK
ROTTNER; LYDIA KIEVIT; REBECCA
SANDERS; BOBBY BRANDON
ARMSTRONG; SERGIO TORRES;
RICHARD WOODRUFF; MARSHALL
LAWRENCE GORDON; JOEL A.
LIPMAN; JAMES GUDGALIS; MARY P.
HOESSLER; STEPHEN M. HAYES;
BRIAN REEVES; SAM HAMMOND;
MARK LEGGETT; EDWIN NAYTHONS;
MICHAEL WASHBURN; IRA D.
DUNST; BRIAN WEBER; KAMNEEL
MAHARAJ; KIM IOCOVOZZI;
HERBERT J. YOUNG; LINDA HASPER;
LESLIE BAYARD; TRICIA FELLERS;
ORLANDO ELLIOTT; JAMES
BONSIGNORE; MARGARET SETSER;
GUILLERMO QUIROZ; DOUGLAS
KURASH; ANDRES CARULLO; LAURA
S. SUTTA; GEORGIA L. THOMAS;
ERIC J. OLSON; JENNIFER MYERS;
TOM WOODWARD; JEROLD
TERHOST; CAMERON JOHN CESTARO;
DONALD BROWN; MARIA FIGUEROA;

No. 15-56064

D.C. No.
2:13-ml-02424-
GW-FFM

CONSTANCE MARTYN; THOMAS GANIM; DANIEL BALDESCHI; LILLIAN E. LEVOFF; GIUSEPPINA ROBERTO; ROBERT TRADER; SEAN GOLDSBERRY; CYNTHIA NAVARRO; OWEN CHAPMAN; MICHAEL BREIN; TRAVIS BRISSEY; RONALD BURKARD; ADAM CLOUTIER; STEVEN CRAIG; JOHN J. DIXSON; ERIN L. FANTHORPE; ERIC HADESH; MICHAEL P. KEETH; JOHN KIRK MACDONALD; MICHAEL MANDAHL; NICHOLAS MCDANIEL; MARY J. MORAN-SPICUZZA; GARY PINCAS; BRANDON POTTER; THOMAS PURDY; ROCCO RENGHINI; MICHELLE SINGLTEON; KEN SMILEY; GREGORY M. SONSTEIN; ROMAN STARNO; GAYLE A. STEPHENSON; ANDRES VILLICANA; RICHARD WILLIAMS; BRADFORD L. HIRSCH; ASHLEY CEPHAS; DAVID E. HILL; CHAD MCKINNEY; MORDECHAI SCHIFFER; LISA SANDS; DONALD KENDIG; KEVIN GOBEL; ERIC LARSON; LIN MCKINNEY; RYAN CROSS; PHILLIP HOFFMAN; DEBRA SIMMONS; ABELARDO MORALES; PETER BLUMER; CAROLYN HAMMOND; MELISSA LEGGETT; KELLY MOFFETT; EVAN GROGAN; CARLOS MEDINA; ALBERTO DOMINGUEZ; CATHERINE BERNARD; MICHAEL

BREIEN; LAURA GILL; THOMAS
SCHILLE; JUDITH STANTON; RANDY
RICKERT; BRYAN ZIRKEL; JAMES
KUNDRAT; ROBERT SMITH; MARIA
KOTOVA; JOSIPA CASEY; LUAN
SNYDER; BEN BAKER; BRIAN
NGUYEN; HATTIE WILLIAMS; BILL
HOLVEY; LOURDES VARGAS;
KENDALL SNYDER; NOMER MEDINA;
SAMERIA GOFF; URSULA PYLAND;
MARCELL CHAPMAN; KAYE
KURASH; HOLLY AMROMIN; JOHN
CHAPMAN; MARY D'ANGELO;
GEORGE RUDY; AYMAN MOUSA;
SHELLY HENDERSON; JEFFREY
HATHAWAY; DENNIS J. MURPHY;
DOUGLAS A. PATTERSON; JOHN
GENTRY; DANIELLE KAY
GILLELAND; JOSEPH BOWE;
MICHAEL DESOUTO,
            *Plaintiffs-Appellees*,

GREG DIRENZO,
            *Petitioner-Appellee*,

HYUNDAI MOTOR AMERICA; KIA
MOTORS AMERICA; KIA MOTORS
CORPORATION; GROSSINGER
AUTOPLEX, INC., FKA Grossinger
Hyundai; JOHN KRAFCIK; HYUNDAI
MOTOR COMPANY; SARAH
KUNDRAT,
            *Defendants-Appellees.*

v.

LINDA RUTH SCOTT,
*Objector-Appellant.*

---

IN RE HYUNDAI AND KIA FUEL
ECONOMY LITIGATION,

JOHN GENTRY; LINDA RUTH SCOTT;
DANIELLE KAY GILLELAND; JOSEPH
BOWE; MICHAEL DESOUTO,
*Plaintiffs*,

and

JAMES BEN FEINMAN,
*Appellant*,

v.

HYUNDAI MOTOR AMERICA; KIA
MOTORS AMERICA; KIA MOTORS
CORPORATION; GROSSINGER
AUTOPLEX, INC., FKA GROSSINGER
HYUNDAI; JOHN KRAFCIK; HYUNDAI
MOTOR COMPANY; SARAH
KUNDRAT,
*Defendants-Appellees.*

No. 15-56067

D.C. No.
2:13-ml-02424-
GW-FFM

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted En Banc September 27, 2018
Pasadena, California

Filed June 6, 2019

Before:  Sidney R. Thomas, Chief Judge; and Andrew J.
Kleinfeld, William A. Fletcher, Marsha S. Berzon, Johnnie
B. Rawlinson, Jay S. Bybee, Milan D. Smith, Jr., Sandra S.
Ikuta, Morgan Christen, Jacqueline H. Nguyen, and
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Nguyen;
Dissent by Judge Ikuta

# SUMMARY[*]

## Class Action / Attorneys' Fees

The en banc court affirmed the district court's orders and judgment certifying a nationwide settlement class, approving a settlement, and awarding attorneys' fees in a multidistrict litigation brought against Hyundai Motor America and Kia Motors America regarding alleged misrepresentations about their vehicles' fuel economy.

Objectors challenged the certification order and fee awards on various grounds, and the en banc court found none of them persuasive.

Concerning the objectors' challenge to the district court's findings regarding the predominance of common factual or legal issues under Fed. R. Civ. P. 23(b)(3), the en banc court held that the district court did not abuse its discretion in finding that common issues predominated. Specifically, the en banc court held that: the inclusion of used car purchasers in the class did not defeat predominance; variations in state law did not defeat predominance; objectors failed to meet their burden of showing that California law did not apply; and application of California law satisfied due process.

The en banc court rejected the objectors' challenges to the adequacy of class counsel.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concerning the objectors' challenges to the settlement approval, the en banc court held that: the notice to class members provided sufficient information; the claim forms were not overly burdensome; and there was no evidence of collusion between class counsel and the automakers. The en banc court held that the district court properly exercised its discretion in calculating the fee award using the lodestar method.

The en banc court held that the district court did not abuse its discretion in denying fees to objector's counsel James Feinman because he did not meaningfully contribute to the class settlement.

Judge Ikuta dissented because she would hold that the district court certified a multistate class action under Fed. R. Civ. P. 23 without determining what law applied to the plaintiffs' claims, in violation of Rule 23 and Supreme Court precedent, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). Judge Ikuta also stated that the majority erred in upholding the district court's award of attorneys' fees, because the district court failed to determine the value of the benefit the class derived from the settlement.

**COUNSEL**

James B. Feinman (argued), James B. Feinman & Associates, Lynchburg, Virginia, for Appellants James Ben Feinman, John Gentry, Linda Ruth Scott, Danielle Kay Gilleland, Joseph Bowe, Michael Desouto.

George W. Cochran (argued), Streetsboro, Ohio; Edward W. Cochran, Shaker Heights, Ohio; John J. Pentz, Sudbury, Massachusetts; for Appellants Caitlin Ahearn and Andrew York.

Steve A. Miller, Steve A. Miller P.C., Denver, Colorado, for Appellant Antonio Sberna.

Matthew Kurilich, Tustin, California, for Appellant Peri Fetsch.

Dennis D. Gibson, Gibson Law Firm, Dallas, Texas, for Appellant Dana Roland.

Elaine S. Kusel (argued), Basking Ridge; Richard D. McCune, McCuneWright LLP, Redlands, California; for Appellees Kehlie R. Espinosa, Lilian E. Levoff, Thomas Ganim, and Daniel Baldeschi.

Benjamin W. Jeffers, Dommond E. Lonnie, James S. Azadian, and Brian H. Newman, Dykema Gossett LLC, Los Angeles, California, for Appellees Kia Motors America Inc. and Kia Motors Corp.

Shon Morgan (argued) and Joseph R. Ashby, Quinn Emanuel Urquhart & Sullivan LLP, Los Angeles, California; Karin Kramer, Quinn Emanuel Urquhart & Sullivan LLP, San

Francisco, California; Dean Hansell, Hogan Lovells LLP, Los Angeles, California; for Appellees Hyundai Motor America and Hyundai Motor Co.

Robert B. Carey and John M. DeStefano, Hagens Berman Sobol Shapiro LLP, Phoenix, Arizona, for Appellees Kaylene P. Brady and Nicole Marie Hunter.

Christopher E. Appel, Philip S. Goldberg, and Cary Silverman, Shook Hardy & Bacon LLP, Washington, D.C., for Amici Curiae Association of Global Automakers and American Tort Reform Association.

Katherine I. McBride, Jason L. Lichtman, and Jonathan D. Selbin, Lieff Cabraser Heimann & Bernstein LLP, New York, New York; Elizabeth J. Cabraser, Roger N. Heller, and Michael W. Sobol, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California; for Amici Curiae Public Justice, National Association of Consumer Advocates, National Consumer Law Center, and The Impact Fund.

Ryan H. Wu and Glenn Danas, Capstone Law APC, Los Angeles, California; Mark S. Greenstone and Jonathan M. Rotter, Glancy Prongay & Murray LLP, Los Angeles, California; for Amici Curiae Hon. Stephen G. Larson (Ret.) and Professor David Rosenberg.

## OPINION

NGUYEN, Circuit Judge, with whom THOMAS, Chief Judge, and W. FLETCHER, BERZON, BYBEE, CHRISTEN, and HURWITZ, Circuit Judges, join in full, and with whom RAWLINSON, Circuit Judge, joins except as to part of section III.B.3:

We review five consolidated appeals from the district court's orders and judgment certifying a nationwide settlement class, approving a settlement, and awarding attorney's fees in a multidistrict litigation brought against defendants Hyundai Motor America and Kia Motors America (the "automakers") regarding alleged misrepresentations about their vehicles' fuel economy.  After extensive litigation, the lead plaintiffs' counsel ("class counsel") and the automakers (collectively, the "settling parties") negotiated a settlement that the district court approved following eight months of confirmatory discovery.  Objectors challenged the certification order and fee awards on various grounds. Finding none of them persuasive, we affirm.

## I.  Factual and Procedural Background

On January 6, 2012, class counsel McCuneWright, LLP filed the first of the putative nationwide class actions, *Espinosa v. Hyundai Motor America*, No. 12-cv-800 (C.D. Cal.).  The *Espinosa* plaintiffs brought claims against Hyundai under California consumer protection statutes and theories of common law fraud and negligent misrepresentation.  They alleged that Hyundai misled consumers throughout the United States by advertising inflated fuel economy standards for the Hyundai Elantra and Sonata vehicle model years 2011–12 based on inaccurate

estimates that Hyundai provided to the Environmental Protection Agency ("EPA"). After several motions to dismiss, amendments to the complaint, and class discovery, including document production, depositions, and expert reports, the *Espinosa* plaintiffs moved to certify a nationwide litigation class of purchasers of Hyundai Elantra and Sonata vehicles.

In November and December 2012, the district court held hearings on the contested class certification motion in *Espinosa*. Although the court issued a tentative ruling declining to certify a nationwide litigation class in light of potentially "material differences" among state laws, it requested supplemental briefing and "did not make a final ruling."

On November 2, 2012, less than four weeks before the *Espinosa* class certification hearing, the automakers issued a press release announcing downward adjustments to the EPA fuel economy estimates for certain of their 2011 through 2013 model year vehicles. Partially in response to an EPA investigation, the automakers created a Lifetime Reimbursement Program ("Reimbursement Program") to compensate owners and lessees of these vehicles for the higher fuel costs associated with the revised fuel economy estimates.

The automakers' announcement sparked a surge of litigation. At the time, *Espinosa* and one other putative class action were the only cases pending against the automakers regarding misrepresentations and omissions in their fuel-economy disclosures and advertisements. After the announcement, several similar lawsuits were filed in state and federal courts around the country, including two, *Hunter v.*

*Hyundai Motor America*, No. 12-cv-1909 (C.D. Cal. filed Nov. 2, 2012), and *Brady v. Hyundai Motor America*, No. 12-cv-1930 (C.D. Cal. filed Nov. 6, 2012), brought by class co-counsel Hagens Berman Sobol Shapiro, LLP, and three in Virginia brought by attorney James B. Feinman. The federal cases were consolidated into a single multidistrict litigation ("MDL") in the Central District of California before the Honorable George H. Wu. *See* 28 U.S.C. § 1407.

Meanwhile, Hyundai and the plaintiffs in *Espinosa*, *Brady*, and *Hunter* attended multiple mediation sessions with a mediator whom the district court found to be "respected and experienced." On February 14, 2013, the parties announced a proposed nationwide settlement for Hyundai vehicles affected by the fuel economy restatement. Kia joined this settlement-in-principle shortly thereafter.

The district court appointed liaison counsel to act on behalf of the plaintiffs not participating in the *Espinosa*, *Brady*, and *Hunter* cases (the "non-settling plaintiffs") and to participate in confirmatory discovery so that the non-settling plaintiffs could objectively evaluate the terms of the settlement. Confirmatory discovery lasted eight months and produced 300,000 pages of documents and under-oath interviews of the automakers' employees, including Hyundai's CEO. Liaison counsel filed status reports with updates on the progress of confirmatory discovery and the non-settling plaintiffs' positions, and the court held several status conferences to discuss issues that arose.

On December 23, 2013, the settling parties sought preliminary approval of the nationwide class settlement and moved to certify a settlement class. The district court ordered multiple rounds of briefing concerning the fairness of the

settlement, sufficiency of the class notice, the claims process, class certification, choice of law, and other issues. At four hearings held between December 2013 and August 2014, the parties addressed concerns raised by the court *sua sponte* as well as by objectors and other non-settling plaintiffs. In response to these concerns, the settling parties twice revised the settlement agreement and notice provisions.

After issuing several detailed written rulings, the district court granted preliminary approval of the settlement and certified the class for settlement purposes on August 29, 2014. The court appointed Hagens Berman and McCuneWright as settlement class counsel. In September and October 2014, the district court held four additional hearings, at which it requested that the parties make additional changes to the settlement notices and website, such as adding information about the Reimbursement Program, and rewording the notices to make them easier to understand.

The amended settlement provided for class members to be notified of the settlement in four ways: (1) a short form notice by mail; (2) an email notification; (3) settlement websites with the long form notice; and (4) flyers provided by dealers. The settlement defined the class as all current and former owners and lessees who bought or leased certain defined vehicles on or before November 2, 2012—the date that Defendants announced they were revising the EPA fuel economy estimates of certain Hyundai and Kia vehicles.

Class members could receive compensation for relinquishing any claims they might have by choosing one of four options:

1. a *lump sum payment* via a debit card, determined by vehicle type and model year, with the cash value approximating the additional fuel cost over a 4.75-year period associated with the revised fuel economy estimates;

2. a *dealer service debit card* worth 150% of the value of their lump sum payment for use at Hyundai or Kia dealers;

3. a *new car purchase certificate* worth 200% of their lump sum payment for use in the purchase of a new Hyundai or Kia vehicle by a class member or their immediate family; or

4. *enrollment in the Reimbursement Program*, which was extended as a result of the settlement from December 31, 2013, to July 6, 2015.

As it had before the settlement, the Reimbursement Program provided recurring payments over the entire period of ownership based on the updated fuel economy estimates, the number of miles driven, and the price of gas in each geographic region, plus a 15% bonus for the inconvenience. Class members already participating in the Reimbursement Program could continue to participate and, in addition, receive a $100 or $50 lump sum payment depending on whether their vehicles were owned or leased.

The class notice websites, which the district court tested, offered an online calculator for class members to estimate the

benefit that they would receive through the Reimbursement Program as compared with the lump sum payment options. Class members could submit their claims online where the form would pre-populate with the class members' information after they entered their vehicle identification number and the unique identification number contained in their class notices.

By the end of March 2015, with more than three months to go before the July 6, 2015, claims deadline, the automakers reported to the district court that the total compensation they had paid or expected to pay to the class members, based on the claims submitted, was more than $140 million. The Reimbursement Program accounted for more than $97 million of this compensation. By May 31, 2015, more than a month before the claims deadline, the participation rate had grown to 23.0%, reflecting 200,013 claims. And when the court included class members' participation in the Reimbursement Program in the analysis, the participation rate jumped to 64.5%.

In July 2014, one month before the settlement received preliminary approval, class counsel began negotiating with the automakers over a fee award, assisted by the same experienced mediator who had helped them reach the settlement agreement. In October 2014, they reached an agreement, pursuant to which class counsel moved for an award of fees.

The district court expressed concern with the request by McCuneWright for a 3.0 lodestar multiplier. On June 1, 2015, after supplemental briefing and an additional hearing, the court awarded McCuneWright $2,850,000 in attorney's fees and $93,550.02 in costs based on a reduced multiplier of

1.5521.  On August 5, 2015, the court awarded Hagens Berman, class counsel in *Hunter* and *Brady*, $2,700,000 in attorney's fees based on a lodestar multiplier of 1.22, and $250,000 in costs.  In addition, the court awarded fees and costs to 26 other firms that reflected lodestar reductions of 27 to 80 percent, including an award of $1,257,000 in fees and $66,000 in costs to liaison counsel Girard Gibbs LLP. The court declined to award fees to Feinman for his representation of the objecting plaintiffs in the three Virginia cases, finding that he "did not meaningfully contribute to the class settlement" and that his "mostly meritless" objections "did not serve to increase the settlement amount or otherwise benefit the class members."

On June 11, 2015, after more than three years of litigation, including eight months of confirmatory discovery, the court issued a 19-page order granting final approval of the class settlement.  Various objectors appealed the district court's orders certifying the class, approving the settlement, and awarding attorney's fees.  A divided three-judge panel of this court vacated the class certification decision and remanded, holding that by failing to analyze the variations in state law, the district court abused its discretion in certifying the settlement class.  *See In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679 (9th Cir. 2018).  A majority of the nonrecused active judges on our court voted to rehear the case en banc.

## II.  Jurisdiction and Standards of Review

The district court had jurisdiction under 28 U.S.C. § 1332(a) and (d).  We have jurisdiction under 28 U.S.C. § 1291.[1]

In light of the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (quoting *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008)), we perform an "extremely limited" review of a district court's approval of a class settlement, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011) (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)).  Parties seeking to overturn the settlement approval must make a "strong showing" that the district court clearly abused its discretion. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) (quoting *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).  As long as the district court applied the correct legal standard to findings that are not clearly erroneous, we will affirm.  *Bluetooth Headset*, 654 F.3d at 940.

We review for abuse of discretion the district court's decision to certify a class for settlement purposes, limiting our review "to whether the district court correctly selected

---

[1] We reject the settling parties' argument that objectors Ahearn and York's appeal from the district court's August 5, 2015 order awarding attorney's fees was untimely.  Another objector, Antonio Sberna, timely appealed the order, and Ahearn and York filed their notice of appeal within 14 days thereafter, as permitted by Federal Rule of Appellate Procedure 4(a)(3).

and applied Rule 23's criteria." *Parra v. Bashas', Inc.*, 536 F.3d 975, 977 (9th Cir. 2008).  Likewise, we review for abuse of discretion the district court's award of attorney's fees and costs to class counsel as well as its method of calculating the fees.  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015).  The factual findings underlying these decisions are reviewed for clear error.  *See Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016) (certification); *Bluetooth Headset*, 654 F.3d at 940 (fees).

## III.  Discussion

### A.  Certification

Before certifying a class, the district court must assure itself that the proposed class action satisfies four prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition to meeting the numerosity, commonality, typicality, and adequacy prerequisites, the class

action must fall within one of the three types specified in Rule 23(b).  Here, the district court certified the class under Rule 23(b)(3), which requires that "questions of law or fact common to class members" must "predominate over any questions affecting only individual members," and the class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The district court's Rule 23(a) and (b) analysis must be "rigorous."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

The criteria for class certification are applied differently in litigation classes and settlement classes.  In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial.  However, such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial.  On the other hand, in deciding whether to certify a settlement class, a district court must give heightened attention to the definition of the class or subclasses.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  The Supreme Court specifically addressed the difference between litigation and settlement classes in *Amchem*.  The Court wrote:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.  But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand

> undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

We addressed concerns about definitions of settlement classes and fairness of proposed settlements in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998):

> District courts must be skeptical of some settlement agreements put before them because they are presented with a "bargain proffered for . . . approval without benefit of an adversarial investigation." [*Amchem*, 521 U.S. at 621].
>
> These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded.

In the case before us, however, we need not analyze all of those criteria, for objectors challenge only the district court's findings regarding the predominance of common factual or legal issues under Rule 23(b)(3) and adequacy of representation under Rule 23(a)(4). We address those findings in turn.

### 1.  Predominance

The predominance inquiry under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. It "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)," and focuses on whether the "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication"; if so, "there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1777 (2d ed. 1986)).

"Predominance is not, however, a matter of nose-counting.  Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres*, 835 F.3d at 1134 (internal citation omitted). Therefore, even if just one common question predominates, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1778 (3d ed. 2005)).

Rule 23(b)(3) lists four non-exclusive factors "pertinent" to a predominance finding:

> (A)    the class members' interests in individually controlling the

prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

These factors must be considered in light of the reason for which certification is sought—litigation or settlement—which "is relevant to a class certification." *Amchem*, 521 U.S. at 619. As noted above, in deciding whether to certify a settlement-only class, "a district court need not inquire whether the case, if tried, would present intractable management problems." *Id.* at 620.

At the same time, a proposal to certify a settlement class presents other concerns—the risk of collusion chief among them—that "demand undiluted, even heightened, attention" by the district court. *Id.* The adversarial nature of a trial ensures that class definitions will be tested and allows the district court "to adjust the class, informed by the proceedings as they unfold." *Id.* A settlement lacks these safeguards. Therefore, the aspects of Rule 23(a) and (b) that are important to certifying a settlement class are "those designed to protect absentees by blocking unwarranted or overbroad class definitions." *Id.* The focus is "on whether a proposed class

has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* at 621.

Objectors Peri Fetsch and Dana Roland dispute that settlement plays any role in the predominance inquiry, arguing that the test is "precisely the same for a settlement class as it [is] for a litigation class." However, they misunderstand both *Amchem* and our statement in *Hanlon* that "[s]ettlement *benefits* cannot form part of a Rule 23(b)(3) analysis." 150 F.3d at 1022 (emphasis added). Our point, and the Supreme Court's holding in *Amchem*, was that the recovery secured through a settlement cannot be the basis for finding that common issues predominate. *Id.*; *Amchem*, 521 U.S. 622–23.

In *Amchem*, the district court found that predominance was satisfied based in part on class members' common interest in the settlement benefits—prompt and fair compensation without the risk and cost of litigation. 521 U.S. at 622. The Supreme Court held that this was error because predominance looks at the cohesiveness of "the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Id.* at 623. But whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement. A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable. *See* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts . . . regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns.").

The Supreme Court said as much in *Amchem*. There, the Third Circuit, which reversed the district court's certification, held that Rule 23(a) and (b)(3)'s requirements "must be satisfied without taking into account the settlement." *Id.* at 619 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996)). Disagreeing, the Supreme Court pointed out that the Third Circuit "should have acknowledged that settlement is a factor in the calculus." *Id.* at 622. The Court concluded that "a remand [was] not warranted," however, because the class did not satisfy Rule 23's requirements "with or without a settlement on the table." *Id.*

The Court also recognized that predominance is "readily met" in cases alleging consumer fraud, *id.* at 625, and the present case is no exception. In many consumer fraud cases, the crux of each consumer's claim is that a company's mass marketing efforts, common to all consumers, misrepresented the company's product—here, a vehicle's fuel efficiency. The class was defined as "[a]ll current and former owners and lessees of [specified vehicles] who were the owner or lessee, on or before November 2, 2012, of such [v]ehicle that was registered [domestically]."[2]    This cohesive group of individuals suffered the same harm in the same way because of the automakers' alleged conduct.

This case is a far cry from *Amchem*, which involved a "sprawling" asbestos settlement class with members who had wide-ranging injuries, some exposure-only and others imminently fatal. 521 U.S. at 623–26. As *Hanlon* explained in distinguishing *Amchem*, the "heart" of the problem there

---

[2] The class definition excluded rental fleet owners, government entities other than in their capacity as an owner or lessee, judges assigned to any of the cases, and persons who had previously released their claims.

was the class members' conflicting interests: current claimants, who were sick, wanted to maximize the immediate payout, whereas healthy claimants had a strong interest in preserving funds in case they became ill in the future. *Hanlon*, 150 F.3d at 1020–21. These vast differences in *Amchem* required "caution [because] individual stakes are high and disparities among class members great." 521 U.S. at 625.

In contrast, here, class members were exposed to uniform fuel-economy misrepresentations and suffered identical injuries within only a small range of damages. Further, as in *Hanlon*, no material conflicts existed among class members. *Id*. at 1021. The district court found that the following undisputed common questions predominated over individualized issues: (1) "[w]hether the fuel economy statements were in fact inaccurate"; and (2) "whether [the automakers] knew that their fuel economy statements were false or misleading." The court also found that the alleged misrepresentations were "uniformly" made via "Monroney stickers and nationwide advertising."[3] We have held that these types of common issues, which turn on a common course of conduct by the defendant, can establish predominance in nationwide class actions. *See Hanlon*, 150 F.3d at 1022–23 (holding that "[a] common nucleus of facts and potential legal remedies dominate[d]" over "idiosyncratic differences between state consumer protection

---

[3] A Monroney sticker is "the label placed on new automobiles with the manufacturer's suggested retail price and other consumer information," 49 C.F.R. § 575.401(c)(4), including information about the vehicle's fuel efficiency, *see* 49 U.S.C. § 32908(b). *See also* 15 U.S.C. § 1232. It is named after Senator A.S. Mike Monroney, a sponsor of the Automobile Information Disclosure Act of 1958, Pub. L. No. 85-506, 72 Stat. 325 (codified as amended at 15 U.S.C. §§ 1231–1233).

laws" where a nationwide class of minivan buyers' claims turned on "questions of [the manufacturer's] prior knowledge of the [vehicle's] deficiency, the design defect, and a damages remedy"); *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182–83 (9th Cir. 2015) (reversing denial of class certification for nationwide class of homebuyers because the alleged "common scheme, if true, present[ed] a significant aspect of [the defendant's] transactions that warrant[ed] class adjudication").

### a. The Inclusion of Used Car Purchasers in the Class Does Not Defeat Predominance

Fetsch and Roland argue that used car purchasers may not have seen the automakers' fuel efficiency representations, because only new cars are required to display the Monroney stickers, and that including used car purchasers in the class creates a factual issue precluding predominance. Their argument ignores the district court's finding that the alleged misrepresentations were made "uniformly"—not only on the Monroney stickers, but also in "nationwide advertising."[4] When misrepresentations are made as part of a nationwide,

---

[4] Various objectors complain that the district court failed to make factual findings in its orders certifying the class, granting final settlement approval, and awarding attorney's fees. Before issuing these orders, however, the district court had already provided its findings and reasoning on the record, which is all that was required. *See Linney*, 151 F.3d at 1242 ("[A] district court need not respond to objections with findings of fact and conclusions of law if the court 'provide[s] a reasoned response elsewhere in the record.'" (second alteration in original) (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995))); *see also Hanlon*, 150 F.3d at 1023 (explaining that the record provided "more than adequate foundation" for review despite the district court's "almost conclusory" findings).

concerted marketing effort, it makes no difference to the predominance analysis whether consumers encounter them in different guises. *See In re Tobacco II Cases*, 207 P.3d 20, 40–41 (Cal. 2009); *see also In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) ("The exact wording of the . . . misrepresentations . . . is not the predominant issue. It is the underlying scheme which demands attention." (quoting *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 431 (D. Ariz. 1992))). Whether or not Hyundai's and Kia's advertising was substantial enough to support an inference of reliance under *In re Tobacco II*, the potential individual questions of reliance for used-car purchasers do not predominate in the context of this proposed settlement class. That some individualized issues might need to be addressed does not in and of itself defeat predominance. The predominance inquiry is mainly concerned with "the balance between individual and common issues." *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 635 (9th Cir. 2018) (emphasis added) (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545–46 (9th Cir. 16 2013)). Indeed, this sort of individual question would only apply to a subset of the class (used-car purchasers) and would primarily implicate trial management issues, which we do not consider when conducting a predominance analysis for a settlement class. *Amchem*, 521 U.S. at 620.

Similarly, even if, as the automakers' expert opined, used car buyers are in a "somewhat different market" than new car buyers and would require a different damages analysis, the district court did not abuse its discretion by finding that common issues of fact predominated. "[T]he mere fact that there might be differences in damage calculations is not sufficient to defeat class certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir.

2015) (quoting *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1026 (9th Cir. 2011)); *see* Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.").

Nor is it clear why the damages here would need to be calculated based on each consumer's willingness to pay for higher fuel efficiency. Fraud damages do not normally correlate with the degree of reliance. *Cf. Tobacco II Cases*, 207 P.3d at 39 ("It is not . . . necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct . . . . It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." (alteration in original) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997))). If a consumer were to establish the threshold level of reliance, the automaker would be liable for the consumer's entire loss from higher-than-expected fuel costs—an amount that can easily be calculated on an individual basis, as it was in the Reimbursement Program.

### b. Variations in State Law Do Not Defeat Predominance

Fetsch and Roland also argue that the district court failed to address variations in state law affecting claims by used car purchasers and that it was required to do so under *Mazza v.*

*American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012). They are incorrect.

Subject to constitutional limitations and the forum state's choice-of-law rules, a court adjudicating a multistate class action is free to apply the substantive law of a single state to the entire class. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823 (1985); *see also Harmsen v. Smith*, 693 F.2d 932, 946–47 (9th Cir. 1982) (explaining that a district court sitting in diversity must "apply the substantive law of the state in which it sits, including choice-of-law rules"); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (noting that "the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side" if *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) did not apply to conflict-of-laws rules). Here, no party argued that California's choice-of-law rules should not apply to this class settlement arising from an MDL in a California court. By default, California courts apply California law "unless a party litigant timely invokes the law of a foreign state," in which case it is "the foreign law proponent" who must "shoulder the burden of demonstrating that foreign law, rather than California law, should apply to class claims." *Wash. Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080–81 (Cal. 2001) (quoting *Bernhard v. Harrah's Club*, 546 P.2d 719, 721 (Cal. 1976)); *accord Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 995 (9th Cir. 2010).

To meet their burden, the objectors must satisfy the three-step governmental interest test.[5]   *Wash. Mut.*, 15 P.3d at 1080–81; *Pokorny*, 601 F.3d at 994–95.  Under that test, the objectors must prove that (1) the law of the foreign state "materially differs from the law of California," *Wash. Mut.*, 15 P.3d at 1080, meaning that the law differs "with regard to the particular issue in question"; (2) a "true conflict exists," meaning that each state has an interest in the application of its own law to "the circumstances of the

---

[5] Relying on *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 469 (1992), the dissent argues that, rather than the governmental interest test, the district court should have applied California's contractual choice-of-law analysis.  Dissent at 75–77.  However, the claims in *Nedlloyd* arose from the contract, namely, breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty.  Here, the claims arise from the automakers' advertising misrepresentations, not the sales contracts.  For example, Scott's sales contract made no claim about an estimated mileage per gallon.  Moreover, as the dissent acknowledges, Dissent at 77, California courts must consider whether the choice-of-law provisions conflict with fundamental public policy and whether California has a greater interest than the chosen state before applying the provisions. *See, e.g.*, *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1323–25 (9th Cir. 2012); *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1003–04 (9th Cir. 2010).  As the automakers argued below, California recognizes that its consumer protection statutes embody a strong public policy and that "Virginia's law provides significantly less consumer protection to its citizens than California law." *Am. Online, Inc. v. Superior Court*, 108 Cal. Rptr. 2d 699, 710 (Cal. Ct. App. 2001). Therefore, given the objectors' cursory arguments below, the district court's failure to apply the sales contracts' choice-of-law provisions was not erroneous. *See Frontier Oil Corp. v. RLI Ins. Co.*, 63 Cal. Rptr. 3d 816, 833 (Cal. Ct. App. 2007) ("[I]f the choice-of-law agreements were unenforceable or did not apply to the class causes of action and the party opposing class certification continued to assert that the law of another state applied to nonresident class members, the trial court must apply the governmental interest analysis to determine which state's law to apply") (citing *Wash. Mut.*, 15 P.3d at 1071).

particular case"; and (3) the foreign state's interest would be "more impaired" than California's interest if California law were applied. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006); *accord Pokorny*, 601 F.3d at 994–95. If the objectors fail to meet their burden at any step in the analysis, the district court "may properly find California law applicable without proceeding" to the rest of the analysis. *Pokorny*, 601 F.3d at 995 (quoting *Wash. Mut.*, 15 P.3d at 1081).

### i.    Objectors Failed to Meet Their Burden of Showing That California Law Does Not Apply

Fetsch and Roland do not suggest that application of California law gives rise to constitutional problems. And before the district court, no objector presented an adequate choice-of-law analysis or explained how, under the facts of this case, the governmental interest test's three elements were met. Further, no objector argued that differences between the consumer protection laws of all fifty states precluded certification of a settlement class. Consequently, neither the district court nor class counsel were obligated to address choice-of-law issues beyond those raised by the objectors, and we will not decertify a class action for lack of such analysis.[6] *See Harmsen*, 693 F.2d at 947 (affirming district

---

[6] The dissent misreads the record in suggesting that the district court entirely "failed to . . . determine what substantive body of law applied." Dissent at 71. To the contrary, the district court ordered supplemental briefing from the *Gentry* objectors on whether Virginia law should apply after issuing a tentative ruling that it was "not convinced that there are any serious differences between the laws of the various states" that would preclude finding predominance satisfied for a settlement class. The *Gentry* objectors' filings were incomplete at best, noting cursorily some

court's application of California law to multistate class where the proponent of foreign law "failed to show, as required by California law, that the law of other states relating to the [state law] claims is significantly different from California's and, more importantly, that the interests of other states would be impaired by application of California law to these non-resident plaintiffs"); *Pokorny*, 601 F.3d at 994–96 (affirming application of California law because the foreign law proponent failed to meet its burden under California's governmental interest test).

*Mazza* is readily distinguishable. There, the foreign law proponent (the defendant) "exhaustively detailed the ways in which California law differs from the laws of the 43 other jurisdictions" and showed how applying the facts to those disparate state laws made "a difference in this litigation." *Mazza*, 666 F.3d at 590–91. Unlike class counsel here, the plaintiffs in *Mazza* did "not contest these differences." *Id.* at 591 n.3. Weighing these arguments and concessions, a

---

differences between California and Virginia law but failing to analyze the elements of the governmental interest test. Nevertheless, the district court held a hearing and, in a subsequent order, addressed the issues raised before concluding that no further conflict-of-law analysis was necessary. As the district court explained, many Virginia consumers "no longer have access to an alleged substantially better remedy," given the *Gentry* objectors' claim that the statute of limitations would have run in Virginia.

To the extent the dissent suggests that the district court must *sua sponte* survey the law of all fifty states, no case law supports this unduly burdensome task. For example, the dissent cites *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 728 (9th Cir. 2007), but that case explicitly "reject[ed] the notion that the district court was obligated to conduct a comprehensive survey of every state's law" on the enforceability of an arbitration class action waiver provision when the plaintiff failed to provide the court with the fifty-state survey. *Id*.

divided panel concluded that the defendant had "met its burden" to show that foreign law applied "[u]nder the facts and circumstances of this case." *Id.* at 591, 594.

Importantly, the *Mazza* class was certified for litigation purposes. The prospect of having to apply the separate laws of dozens of jurisdictions presented a significant issue for trial manageability, weighing against a predominance finding.[7] *See also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190–92 (9th Cir. 2001) (treating state law variations as a subspecies of trial manageability concerns). In settlement cases, such as the one at hand, the district court need not consider trial manageability issues. *Amchem*, 521 U.S. at 620.

In *Hanlon*, we affirmed certification under Rule 23(b)(3) of a nationwide settlement class of car owners alleging violations of various state consumer laws. 150 F.3d at 1017, 1022. We held that common questions as to the defendant's knowledge and the existence of the problem (the same questions at issue here) predominated, notwithstanding "variations in state law." *Id.* at 1020, 1022–23. In rejecting the objectors' argument that "the idiosyncratic differences between state consumer protection laws" defeated predominance, we reasoned that the claims revolved around a "common nucleus of facts" and applied the longstanding rule that "differing remedies" do not preclude class certification. *Id.* at 1022–23. That same reasoning applies with even greater force here, where the class claims turn on

---

[7] Even so, *Mazza* left open the possibility of certifying a nationwide class "with subclasses for class members in different states, with different jury instruction[s] for materially different bodies of state law." 666 F.3d at 594.

the automakers' common course of conduct—their fuel economy statements—and no objector established that the law of any other states applied.[8]

### ii.  Application of California Law Satisfies Due Process

Objector Linda Ruth Scott, a lead plaintiff in a Virginia class action that was transferred to California as part of the MDL, argues that application of California law violates her due process rights.[9]  She asserts that Virginia, unlike most jurisdictions, does not provide cross-jurisdictional tolling of the statutes of limitations on her claims notwithstanding that her case was stayed upon transfer and remained pending in Virginia at the time of certification.  Thus, she argues, certification of a nationwide class left Virginia class members with no real opportunity to opt out because their claims would otherwise be dismissed as time-barred.[10]

---

[8] Even if the *Gentry* plaintiffs had adequately raised and convincingly argued the distinctions between California and Virginia law under the governmental interest test or the contractual choice-of-law provision, the district court found that the potential differences in Virginia law were not so substantial as to predominate over other common issues or to preclude certification.  That was not an abuse of discretion, and it is entirely consistent with our analysis in *Hanlon*, 150 F.3d at 1022–23.

[9] The settling parties assert that the district court did not apply any state's law to the claims at issue because the settlement eliminated the need to resolve them.  We need not address this question and assume, for the purposes of Scott's due process argument, that the district court applied California law.

[10] Scott's argument has been a moving target.  In opposing certification, she failed to raise a due process claim or request certification of a subclass.  Rather, she asserted that by postponing its certification

But Scott does not dispute that she, like all class members, had the *right* to opt out. *See Epstein v. MCA, Inc.*, 179 F.3d 641, 648 (9th Cir. 1999); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1999) ("[B]efore an absent class member's right of action [is] extinguishable due process require[s] that the member 'receive notice plus an opportunity to be heard and participate in the litigation,' and . . . 'at a minimum . . . an absent plaintiff [must] be provided with an opportunity to remove himself from the class.'" (quoting *Shutts*, 472 U.S. at 812) (last omission and last alteration in original)). Rather, she contends that as a practical matter, she and other Virginia class members "[could not] opt out of this nationwide class action settlement because the District Court refused to certify a Virginia subclass with recognized class representatives asserting Virginia causes of action."

Attorney Feinman, however, acknowledged that he filed a class action (along with two other mass actions) in Virginia after the creation of the MDL to toll the statute of limitations there, preserving claims for Virginia plaintiffs who decided to opt out of the MDL settlement. Indeed, a handful of Virginia plaintiffs did opt out of the settlement and continued their litigation in Virginia, along with plaintiffs who purchased subject vehicles after November 2, 2012, without any statute of limitations issues. *See Gentry v. Hyundai Motor Am., Inc.*, No. 3:13-CV-00030, 2017 WL 354251

---

decision until it approved the settlement, the district court violated its obligation to rule on certification "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1)(A). In supplemental briefing ordered by the district court to address cross-jurisdictional tolling, Scott then raised her due process argument and asked the court to deny nationwide class certification "until a Virginia sub-class is created" or remand "to allow the Virginia class the opportunity to obtain certification to preserve the statute of limitations."

(W.D. Va. Jan. 23, 2017), *aff'd in part, dismissed in part sub nom. Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278 (4th Cir. 2018), *cert. denied*, 2018 WL 5085410 (U.S. 2018).**[11]** Ultimately, the Virginia courts dismissed two out of the three actions for pleading deficiencies. The sole remaining action survived the pleading stage with only one lemon law claim regarding the onboard mileage calculator, not the fuel economy misrepresentations at issue in the MDL. The statute of limitations issue raised here did not feature in the district court's or Fourth Circuit's decisions.

Even assuming that the statute of limitations would have barred the claims of Virginia plaintiffs who opted out of the settlement, *Hanlon* forecloses Scott's requested relief. In *Hanlon*, as here, multiple class actions were filed and then consolidated in California following a federal agency's investigation, with the defendant announcing a remedial plan and entering into a settlement only after the class moved for certification. *See* 150 F.3d at 1018. Like Scott, an objector in *Hanlon* filed a late class action in another state and sought to litigate it in contravention of the district court's orders. *See id.* at 1019. We explained that while the objector was free to opt out of the class by filing the out-of-state action, he had no right to do so on behalf of anyone else:

> The procedural due process rights of [class] members include an opportunity to be excluded from the action. The right to participate, or to opt-out, is an individual one and should not be made by the class representative or the class counsel. There is

---

**[11]** We hereby **GRANT** Scott's motion for judicial notice of the petition for writ of certiorari arising from the Fourth Circuit case.

no class action rule, statute, or case that allows a putative class plaintiff or counsel to exercise class rights en masse, either by making a class-wide objection or by attempting to effect a group-wide exclusion from an existing class. Indeed, to do so would infringe on the due process rights of the individual class members, who have the right to intelligently and individually choose whether to continue in a suit as class members. Additionally, to allow representatives in variously asserted class actions to opt a class out without the permission of individual class members "would lead to chaos in the management of class actions."

*Id.* at 1024 (internal citations omitted) (quoting *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 412 (2d Cir. 1975)).

Scott claims that the statute of limitations issue and due process "require[] that the [Virginia] [sub]class *as a whole* be remanded" (emphasis added). But what she seeks to do here is exactly what *Hanlon* held was forbidden—opt out a state subclass.

Finally, Scott argues that by "not creating a Virginia subclass," the district court was "using the [MDL] process and [Rule] 23 to deny the Virginians their day in court." But she has it backwards. Scott seeks to displace the operation of federal law—the MDL statute and class certification rules—to accommodate a single state's tolling rule. The Supremacy Clause forecloses such an argument. *See Shady*

*Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398–99 (2010) (explaining that if a proposed class meets Rule 23's criteria, state law cannot prohibit certification).

Scott relies heavily on *Shutts* to support her due process claim, but she misunderstands the due process rights it addressed.[12]  *Shutts* distinguished the "minimum contacts requirement" that can be asserted by "out-of-state defendants or parties in the procedural posture of a defendant" in multistate cases from the process due "to absent class-action plaintiffs" based on their "constitutionally recognized property interest" in "a chose in action."  472 U.S. at 807. Because absent class plaintiffs face fewer litigation-related burdens than out-of-state defendants in nonclass suits, "the Due Process Clause need not and does not afford the former as much protection from . . . jurisdiction as it does the latter." *Id.* at 811.  "[T]o bind an absent plaintiff concerning a claim for money damages or similar relief at law," the district court is obligated to provide only "minimal procedural due process protection."  *Id.* at 811–12.  *Shutts* "identified various procedural safeguards that are necessary to bind absent class members, including notice, the opportunity to be heard, the opportunity to opt out, and adequate representation," *Epstein*, 179 F.3d at 648, all of which were present here.

---

[12] The settling parties also contend that Scott's due process argument is unripe.  We need not resolve this question because the certification issue Scott raises is dispositive. *See Ortiz.*, 527 U.S. at 831 (1999) ("Ordinarily, [an] . . . Article III court must be sure of its own jurisdiction before getting to the merits.  But the class certification issues are, as they were in *Amchem*, 'logically antecedent' to Article III concerns, and . . . may properly be treated before [them]." (internal citations omitted) (quoting *Amchem*, 521 U.S. at 612)).

As for the minimum contacts requirement, which out-of-state defendants could raise, that the application of a state's law must not be "arbitrary [or] fundamentally unfair," California has extensive contacts that satisfy this due process requirement here. *Id.* at 818. For example, Hyundai Motor America is incorporated and has its principal place of business in California and roughly 10.7% of the class vehicles were sold in California.

\*       \*       \*

In sum, the district court did not abuse its discretion in finding that common issues predominated.

## 2. Adequacy

Separate from the predominance analysis, due process "requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Shutts*, 472 U.S. at 812. This adequacy requirement, formalized in Rule 23(a)(4), "serves to uncover conflicts of interest between named parties and the class they seek to represent" as well as the "competency and conflicts of class counsel." *Amchem*, 521 U.S. at 625, 626 n.20. To determine legal adequacy, we resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Scott contends that class counsel were inadequate because they failed to protect the rights of absent Virginia class

members to opt out of the settlement.  Since class counsel did in fact protect Virginians' right to opt out, this argument is meritless.

Scott also argues that class counsel Hagens Berman, the firm representing the *Brady* and *Hunter* plaintiffs, now has a potential conflict with the class.  She asserts that more than two years after the settlement was signed, Hagens Berman and the firm representing Hyundai jointly represented consumers in a putative class action suit against Volkswagen for alleged fraud regarding vehicle emissions.  Scott identifies no authority establishing that a co-counsel relationship between class counsel and defense counsel in a future, unrelated case presents a conflict.

## B.  Settlement Approval

A binding settlement must provide notice to the class in a "reasonable manner" and otherwise be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1), (2).  Various objectors allege inadequacies in the notice and claim forms and purported collusion between class counsel and the automakers.  None of their claims have merit.

### 1.  The Notice to Class Members Provided Sufficient Information

Before the district court approves a class settlement under Rule 23(e), it is "critical" that class members receive adequate notice.  *Hanlon*, 150 F.3d at 1025.  To satisfy Rule 23(e)(1), settlement notices must "present information about a proposed settlement neutrally, simply, and understandably."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009).  "Notice is satisfactory if it

'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Id.* (quoting *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

Fetsch and Roland argue that class members who were already participating in the automakers' voluntary Reimbursement Program "likely were unaware that additional compensation . . . could be received" by remaining in the program because this information was "buried" on page 11 of the long form notice and was omitted from the short form and email notices. In fact, the very first page of the long form notice informed class members: "If you previously received money under the [Reimbursement Program], you may still be able to receive a payment from the Settlement."

As for the short form notice, it was designed to be, as the name suggests, short. Its primary purpose was to alert class members to the settlement, provide a high-level overview of the process, including critical dates, and explain where class members could obtain additional information, such as eligibility information and claim forms. In addition, after outlining some of the potential compensation, it informed class members that "[o]ther settlement benefits exist" and invited them to use an online calculator to estimate their individual benefit under each of the various compensation options based on a host of personalized factors. The short form notice "highly recommended" that class members "use this reimbursement calculator to evaluate [their] options based on [their] own circumstances . . . before submitting a claim." This notice was more than adequate.

Nor was it misleading for the various notices to inform class members that "[h]igh mileage drivers may receive

greater amounts by participating in the . . . Reimbursement Program." Since compensation under the Reimbursement Program was proportional to the number of miles driven and thus theoretically unlimited, that statement was true. Moreover, it served the valuable purpose of warning high-mileage drivers that choosing a lump sum payment might not have been in their best interests.

Finally, in arguing that the notices did not explain in a "step-by-step" formula how each class member's benefit is calculated, Fetsch and Roland seek to impose a higher standard than is required. A settlement notice need not "provide an exact forecast" of the award each class member would receive, let alone a detailed mathematical breakdown; it merely must give class members "enough information so that those with 'adverse viewpoints' could investigate and 'come forward and be heard.'" *Online DVD-Rental*, 779 F.3d at 946–47 (9th Cir. 2015) (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012)).

## 2.  The Claim Forms Were Not Overly Burdensome

Objectors Ahearn and York argue that no claim forms were necessary at all and that the automakers should have automatically made lump sum payments to class members who did not request another form of compensation. They cite no evidence that this was possible. The district court found that the automakers did "not have complete records of resales of the class vehicles," and Ahearn and York fail to explain how the automakers could have identified subsequent purchasers who were also part of the class. They do not dispute that it was reasonable for the settlement to provide class members with different monetary recovery options based on miles driven and ownership status—information

also not in the automakers' possession.  Given that the automakers lacked complete information to determine the identities of all class members and the amounts of their claims, the district court properly exercised its discretion in finding that "some sort of claims process is necessary in order to verify . . . that the claimant is a current owner, former owner, or current or former lessee of a qualifying vehicle."

Ahearn, York, Fetsch, and Roland contend that the claim forms required too much documentation, such as proof of a class member's current address and proof of sale or ownership, and that this documentation burden is reflected in low claim participation rates.  However, class members could easily avoid most documentation requirements by submitting an online claim form, which pre-populated information after class members entered their vehicle identification number and the unique class member identification number provided by their notices.  Fetsch and Roland cite no evidence that any claims submitted on the paper claim form were, as they speculate, "denied because one box was not checked or one piece of documentation was not turned in."

Ahearn and York contend that the 21% of class members who had filed claims for lump sum payments as of March 31, 2015 was an unreasonably low participation rate and that the "daunting claim form" was to blame.  As of May 31, 2015—more than a month before the July 6, 2015 claims deadline—the participation rate of lump sum claimants had increased to 23%.  We have approved class action settlements "where less than five percent of class members file claims." *Online DVD-Rental*, 779 F.3d at 945; *see also Rodriguez*, 563 F.3d at 967 (holding that the district court did not abuse its discretion in approving settlement class where 14% of 376,301 putative class members returned claim forms).  And

the 23% participation rate here must be viewed in light of the 59% of class members who took advantage of the Reimbursement Program prior to notice of the settlement. As the district court recognized, many of these class members "would decide not to submit a claims form at all" if they were satisfied with the automakers' voluntary compensation.

### 3. There Is No Evidence of Collusion Between Class Counsel and the Automakers

Rule 23(e) ensures that unnamed class members are protected "from unjust or unfair settlements affecting their rights." *Amchem*, 521 U.S. at 623 (1997). When the district court determines that a proposed settlement is fundamentally fair, adequate, and reasonable, our review "is extremely limited." *Hanlon*, 150 F.3d at 1026. We consider the overall fairness of "the settlement taken as a whole, rather than the individual component parts," because "[n]either the district court nor this court ha[s] the ability to 'delete, modify or substitute certain provisions.'" *Id.* (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982)).

The objectors argue that the settlement reached here was a "sweetheart deal." To the contrary, the settlement bears none of the typical signs of collusion between class counsel and defendants, such as when class counsel "receive a disproportionate distribution of the settlement," *Bluetooth Headset*, 654 F.3d at 947 (quoting *Hanlon*, 150 F.3d at 1021), the agreement contains a "clear sailing" provision for attorney's fees "separate and apart from class funds," *id.*, or unawarded fees revert to the defendants rather than to the class, *id.* This case stands in contrast to *Bluetooth Headset*, in which the settlement paid the class "zero dollars" and

contained a "clear sailing" provision in which "defendants agreed not to object" to an award of attorney's fees totaling eight times the *cy pres* award, and a "kicker" clause whereby "all fees not awarded would revert to defendants." *Id.* at 938, 947. The district court there made no findings under *either* the lodestar or the percentage method and instead awarded what "defendants agreed to pay." *Id.* at 943.

The settlement also bears no resemblance to the one in *Amchem*, which allowed defendants to withdraw in ten years while the class remained bound in perpetuity, limited the number of plaintiffs who could reject it and pursue individual claims each year, set annual caps on claims for each disease, set numerical and dollar limits on extraordinary claims above the fixed compensation ranges, offered no adjustments for inflation, and provided no compensation for certain claims and injuries. *Amchem*, 521 U.S. at 604–05, 627. Here, the settlement has no clear sailing or kicker clauses, the automakers successfully litigated a reduction in fees, the court made findings, and the class received tens of millions of dollars. Moreover, the settlement here "was negotiated over multiple mediation sessions with a respected and experienced mediator," class counsel were "experienced," and class members had plenty of opportunities to raise their concerns at seven hearings over seventeen months.

Fetsch and Roland assert that the automakers "looked for a settling group of plaintiffs that would provide them the lowest settlement cost," a phenomenon known as a "reverse auction." *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099 (9th Cir. 2008). As in *Negrete*, however, they have "floated out the specter of a reverse auction, but brought forth no facts to give that eidolon more substance." *Id.*

It is true, as Fetsch and Roland point out, that class action defendants are generally indifferent to the allocation of settlement funds between class and counsel, which can encourage a settlement that is overly generous to counsel at the expense of the class. But here such concerns are out of place. No objector disputes the district court's finding that the settlement "provides substantial relief," including a "substantial cash payout, ranging from $240 to $1,420" per class member. The settling parties agreed on the amount of class compensation more than six months *before* negotiating, "over multiple mediation sessions with a respected and experienced mediator," the "reasonable" attorney's fees provided in the settlement agreement. We have previously approved such an approach, *see Hanlon*, 150 F.3d at 1029, and "[w]e put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution," *Rodriguez*, 563 F.3d at 965.

Providing further assurance that the agreement was not the product of collusion, class counsel McCuneWright did not reach an agreement with the automakers regarding the amount of attorney's fees to which they were entitled. After a contested fee motion, the district court awarded McCuneWright approximately half of the fees that they had requested.

Finally, the objectors contend that the unreasonably high attorney's fees award evidences collusion in the settlement. Ahearn and York argue that the award "bears all the hallmarks of collusion," and Fetsch and Roland claim that class counsel was motivated to give the automakers a "great deal" in exchange for not opposing their requested fees.

Courts in this circuit determine attorney's fees in class actions using either the lodestar method or the percentage-of-recovery method. *Hanlon*, 150 F.3d at 1029. "The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate." *Id.* The district court may then adjust the resulting figure upward or downward to account for various factors, *see Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment, *Hanlon*, 150 F.3d at 1029.

In class action cases where the defendants provide monetary compensation to the plaintiffs, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth Headset*, 654 F.3d at 942. In the percentage method, "the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee," using 25% as a benchmark. *Hanlon*, 150 F.3d at 1029. Similar to the lodestar, the 25% benchmark can be adjusted upward or downward, depending on the circumstances. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). When valuing the settlement is difficult or impossible, the lodestar method may prove more convenient, *see Hanlon*, 150 F.3d at 1029, but "no presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other," *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994).

Here, the district court properly exercised its discretion in calculating the fee award using the lodestar method. As the

district court found, the automakers "will pay attorneys' fees separately from the amount allocated to those covered by the class." Moreover, it is difficult to estimate the settlement value's upper bound. The settlement extended the Reimbursement Program's enrollment deadline by a year and a half, allowing additional class members to participate. These class members will continue to receive compensation from the program for many years into the future, the present value of which will depend on how many miles they drive and their cost of fuel.

Ahearn and York argue that the district court erred by not confirming that attorney's fees were 25% or less of the settlement's value. However, the district court in fact cross-checked the lodestar amount and specifically found that the "total amount of attorney's fees awarded in this case is far lower than the 25% of the settlement figure used as a 'benchmark' in many class action cases in the Ninth Circuit." We have affirmed fee awards totaling a far greater percentage of the class recovery than the fees here. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047–48 (9th Cir. 2002) (no abuse of discretion to award fees constituting 28% of the class's recovery given "risk" assumed in litigating); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (no abuse of discretion where the "$4 million award (thirty-three percent [of the class's recovery]) for attorneys' fees is justified because of the complexity of the issues and the risks").

In any event, we do not require courts employing the lodestar method to perform a "crosscheck" using the percentage method. This would make "little logical sense," 5 Rubenstein, *supra*, § 15:92, because "the lodestar method yields a fee that is presumptively [reasonable]." *Perdue v.*

*Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). The percentage method is merely a shortcut to be used "in lieu of the often more time-consuming task of calculating the lodestar," but only if "the benefit to the class is easily quantified." *Bluetooth Headset*, 654 F.3d at 942. Even then, it is at best a rough approximation of a reasonable fee.[13]

---

[13] The dissent claims that the district court relied on a preliminary, "speculative estimate" of the settlement value and "never got [an] update" on the actual benefit to the class. Dissent at 79–80. To the contrary, the district court issued a detailed tentative order that directed counsel to provide an update of the settlement value and, at the final fairness hearing on June 11, 2015, defense counsel confirmed the participation rates and advised the court that the calculations did not differ "in a material way" from the numbers discussed in the court's tentative order. The dissent also ignores that participation rates are a mathematical predicate to valuing this settlement. Dissent at 80 n. 8.

Further, the district court did not abuse its discretion in including the Reimbursement Program benefits in the overall settlement value, because the settlement extended the time for enrollment and provided additional compensation to Reimbursement Program enrollees. Finally, the court's assessment was well-supported by expert reports. By March 2015, the class recovery totaled roughly $159 million, with the claims deadline still months away. This figure reflects the $50 million in Reimbursement Program claims filed by the original deadline, another $65 million in Reimbursement Program claims after the deadline was extended, and conservatively $44 million in lump sum payments. *See* Dist. Ct. Dkt. Nos. 454, 453, 452, 451, 390, 389.

Finally, in faulting the district court for failing to "subject [the reports] to any rigorous examination," Dissent at 81 n. 9, the dissent misreads these reports, which treat Reimbursement Program enrollees the same regardless of when they enrolled. Understandably, the district court did not discuss the reports in detail in open court because they were filed under seal and confidential.

Ahearn and York also object to the district court's use of a lodestar multiplier.  The district court, which had ably managed this complex litigation for several years and observed various counsel's performance during numerous hearings and through extensive briefing, was in the best position to evaluate each firm's contributions.  The record shows that the district court carefully made this assessment in determining the appropriate amount of attorney's fees and explained the basis of its ruling.  The district court applied *downward* multipliers of 27 to 80 percent to the lodestars for the non-settling parties' counsel because they "had a more minor role in the [MDL] and did not participate [in] negotiating the primary settlement."  The court applied a multiplier of 1.22 to the fee award for class counsel Hagens Berman due to "the complexity and volume of work that counsel engaged in in order to diligently pursue this case and develop its primary theory of liability," finding the multiplier in line with others in comparable complex and multi-year multidistrict litigations.  And the court applied a multiplier of 1.5521 to the fees for class counsel McCuneWright because they "assumed more risk than other firms" by being one of the first firms to take up this cause, having filed *Espinosa* nearly 10 months before the automakers announced the fuel efficiency revisions.

These multipliers are modest or in-line with others we have affirmed.  *See, e.g.*, *Viscaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (upholding a lodestar multiplier cross-check showing a multiplier of 3.65); *Kelly v. Wengler*, 822 F.3d 1085, 1093, 1105 (9th Cir. 2016) (affirming lodestar multipliers of 2.0 and 1.3).  The district court's limited use of the multipliers was well within its broad discretion to determine the amount of reasonable fees, *see Fox v. Vice*, 563 U.S. 826, 838 (2011) (emphasizing and

instructing appellate courts to give "substantial deference" to attorney's fees calculations because "trial courts need not, and indeed should not, become green-eyeshade accountants" and because of "the district court's superior understanding of the litigation" (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983))), and does not support a finding of collusion.

## C.  Denial of Attorney's Fees to Feinman

Last, Scott and her counsel Feinman challenge the district court's ruling that Feinman was not entitled to attorney's fees because he conferred no benefit on the class.[14]   "[W]here objectors do not add any new legal argument or expertise, and do not participate constructively in the litigation or confer a benefit on the class, they are not entitled to an award premised on equitable principles."   *Rodriguez v. Disner*, 688 F.3d 645, 659 (9th Cir. 2012).

The district court denied Feinman's $800,172.79 fee request because he "did not meaningfully contribute to the class settlement."   Feinman sought fees on the theory that his due process arguments, which were rejected below and we reject here, were somehow beneficial to the class.  However, these arguments are not only baseless, but also detrimental to the class; if adopted, they would permit Scott to hold hostage any class recovery under the settlement until she received the unique benefit of being certified to represent a Virginia subclass.   Furthermore, Feinman does not dispute that he engaged in obstructive conduct throughout the litigation,

---

[14] Feinman also takes issue with the district court's statement that his "work was largely *duplicitous* or without merit" (emphasis added).  As he acknowledged, however, the court likely intended to state that his work was "duplicative."

including moving for discovery despite a stay and moving to remand despite an ongoing MDL.  The district court did not abuse its discretion in denying fees.

## IV.  Conclusion

Over the course of several years, the district court performed an admirable job of managing this complex litigation.  After the settlement was announced, the district court held multiple status conferences and requested several rounds of briefing to ensure that all of the litigants' concerns were heard and addressed.  It made careful findings, which the objectors here largely do not challenge, and which more than support the judgment.

**AFFIRMED.**

IKUTA, Circuit Judge, with whom KLEINFELD and M. SMITH, Circuit Judges, join, and with whom RAWLINSON, Circuit Judge, joins in part,[*] dissenting:

The district court in this case certified a multistate class action under Rule 23 of the Federal Rules of Civil Procedure without determining what law applied to the plaintiffs' claims. It then awarded attorneys' fees without determining the value of the benefit the class derived from the settlement. This is contrary to Rule 23 and Supreme Court precedent, *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). I dissent.

I

Defendants Hyundai and Kia overstated the fuel efficiency of certain vehicles that they manufactured and sold. After an EPA investigation confirmed this overstatement, Hyundai and Kia announced that they would lower the fuel efficiency estimates for the affected cars and simultaneously announced that they were each instituting a voluntary reimbursement program to compensate affected vehicle owners and lessees for the additional fuel costs that they had incurred and would incur in the future as a result of the overstated fuel efficiency statements. This announcement set off a flurry of litigation across the country. In *Espinosa v. Hyundai Motor America*, an action pending in district court in California, Hyundai filed an extensive "Appendix of Variations in State Laws," which detailed the differences in the applicable state consumer protection laws and common law fraud actions. The district court initially found these state

---

[*] Judge Rawlinson joins the portion of the dissent concluding that the district court gave an insufficient explanation for applying a fee multiplier.

law differences so material that it tentatively ruled the class could not be certified.

Meanwhile, the Multidistrict Litigation (MDL) judicial panel consolidated over fifty other actions before the district court in which *Espinosa* was pending.   After MDL consolidation, Hyundai and Kia moved for certification of a nationwide class and preliminary approval of a class settlement they had negotiated with counsel for three of the MDL cases, *Espinosa*, *Hunter et al. v Hyundai Motor et al.*, and *Brady et al. v. Hyundai Motor et al.*  Objecting to class certification, plaintiffs in *Gentry et al. v. Hyundai Motor America*, an action that had been filed in a Virginia district court before being consolidated in the MDL, argued that variations in state law defeated the predominance of common questions.   The Virginia plaintiffs argued that they had purchased their vehicles under sales contracts that contained valid choice of law provisions requiring Virginia law to be applied to any claims.  The Virginia plaintiffs further claimed that Virginia law provided a materially different remedy to Virginia consumers for certain claims and such material differences between Virginia and California consumer protection law precluded certification of a nationwide class.

Despite those objections, the district court declined to decide what law was applicable to the plaintiffs' claims and certified the class without ruling on this threshold legal issue or conducting a choice of law analysis.  The district court acknowledged that the court "would need to engage in an extensive choice of law analysis" if the case were going to trial, but the district court erroneously thought that such an analysis was not required to certify a settlement class.  In response to the Virginia plaintiffs' objections, the district court concluded that any substantial differences in state law

could be addressed as part of the Rule 23(e) fairness hearing. *See* Fed. R. Civ. P. 23(e).  The court certified the class and later approved the settlement.

In its tentative ruling granting final settlement approval, the court estimated that the settlement value was some $210 million, relying on a rough estimate that the settling parties had provided a year earlier.  According to the objectors, however, claims attributable to the settlement added up to about $21 million at the time of final approval. Although another $23 million in class claims were filed by class members, the objectors contend that those class members were already participating in Hyundai and Kia's voluntary reimbursement program before the settlement, and therefore the value of their claims could not be attributable to the settlement.

Relying on this estimate that some $210 million was provided by the settlement, the district court awarded nearly $9 million in total attorneys' fees to class counsel.  It used a lodestar multiplier of 1.22 for the *Hunter* and *Brady* plaintiffs' counsel on the ground that they undertook a large volume of complex work.  It used a lodestar multiplier of 1.5521 for the *Espinosa* plaintiffs' counsel on the ground that they had assumed greater risk by filing a lawsuit before the EPA had announced the results of its investigation.  A number of class members objected, arguing that the attorneys' fees award was excessive in proportion to the actual benefit obtained on behalf of the class.  The district court summarily rejected these arguments.

II

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23 of the Federal Rules of Civil Procedure] have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). For a class certified under Rule 23(b)(3), a court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In order to determine whether the Rule 23 prerequisites are met, a district court must determine what state law (or laws) apply to the plaintiffs' claims. "Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (quoting 28 U.S.C. § 2072(b)), a court cannot certify a class if doing so would deprive litigants of the benefit of the appropriate substantive law applicable to their claims, even if a class action "would provide the most secure, fair, and efficient means" of compensating plaintiffs, *Amchem*, 521 U.S. at 628. Identifying the applicable law is particularly crucial in a multi-state class action, because a district court cannot reasonably make a finding regarding predominance and superiority without doing so. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740–41 (5th Cir. 1996) (holding that "a district court must consider how variations in state law affect predominance and superiority"); *see also Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) (holding that "the law on predominance requires the district

court to consider variations in state law when a class action involves multiple jurisdictions").

The district court must identify the law that applies to plaintiffs' claims regardless whether the court is certifying a litigation class or a settlement class. While "a district court need not inquire whether the case, if tried, would present intractable management problems" when considering a request to certify a settlement class, "other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620. "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.*

It is well established "that problems beyond those of just manageability may exist when a district court is asked to certify a single nationwide class action suit, even for settlement purposes, when claims arise under the substantive laws of the fifty states." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529–30 (3d Cir. 2004). If the plaintiffs are not governed by the same legal rules, e.g., if the law of consumer protection or the requisite mens rea differs from jurisdiction to jurisdiction, the court may not be able to find that "common questions of law or fact" predominate or that "a class action is superior to other available methods" to resolve a claim. *See Lozano*, 504 F.3d at 728 (holding that the district court reasonably concluded that predominance was defeated when the standard for upholding a class action waiver differed from state to state). We have scrutinized state law variations even when a class is proposed only for

settlement in order to determine whether "the idiosyncratic differences between state consumer protection laws" were "sufficiently substantive to predominate over the shared claims." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022–23 (9th Cir. 1998). Moreover, courts may not accept on faith the parties' assertions that there are no relevant variations in state laws. *Castano*, 84 F.3d at 741. Rather, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem*, 521 U.S. at 614.

And, important here, *Amchem* clarified that federal courts "lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper." *Id.* at 622.

### III

In this action, the district court failed to discharge its threshold responsibility to determine what substantive body of law applied to the plaintiffs' claims before it certified the class. Rather than conclude that California law could be applied to the claims of all plaintiffs, or that various state laws applied but the differences did not defeat predominance, the district court simply pretermitted the entire issue, concluding that it was not necessary to consider what state law applied, or whether the differences in state law were large or small. The district court relied on two erroneous assumptions in reaching this conclusion: first, that a choice of law analysis was not necessary in the settlement context; and second, that any state law variations could be addressed as part of the final fairness hearing under Rule 23(e).

As explained above, both of these rationales fail. The district court's reliance on the settlement context to justify its

failure to consider state law variations through a choice of law analysis violates *Amchem*'s rule that the predominance inquiry concerns "questions that preexist any settlement." 521 U.S. at 623.   Nor could the district court rely on a fairness hearing to resolve any material differences in state law.   "[A] fairness hearing under Rule 23(e) is no substitute for rigorous adherence to those provisions of the Rule designed to protect absentees[.]"  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999) (internal quotation marks omitted).

The majority's reasons for supporting the district court's decision despite its failure to conduct a necessary choice of law analysis are equally flawed.[1]  While *Amchem* held that a court had to give "undiluted, even heightened, attention" to all Rule 23 prerequisites (other than management issues) before certifying the class, 521 U.S. at 620, the majority minimizes this direction.   Instead, the majority indicates that the absence of manageability concerns is of key importance in certifying a settlement class.   The majority follows the district court's lead by pretermitting any discussion of state law variations that might affect a predominance analysis, Maj. at 39–40, and instead suggesting that a district court need focus on only a limited range of issues such as whether the settlement is fair and non-collusive, and whether the settlement class is sufficiently cohesive, Maj. at 34–39.

---

[1] The majority seizes on the district court's *tentative* ruling that it was "not convinced" there were material differences in state law, and it also notes that the district court ordered supplemental briefing on the choice of law issue.   Maj. at 44–45 n.6.   But as the majority aptly recognizes elsewhere in its opinion, a tentative ruling is not a final ruling, even when supplemental briefing is requested.   Maj. at 24.   And as the majority implicitly acknowledges, the district court declined to make any final ruling, instead merely stating "that no further conflict-of-law analysis was necessary."   Maj. at 44–45 n.6.

The majority also attempts to distinguish *Amchem* by limiting the case to its facts, suggesting it applies only to a "sprawling" settlement class whose members have "wide-ranging injuries" and other "vast differences." Maj. at 37–38. But *Amchem*'s broad articulation of its rules withstands such mischaracterization and inappropriate narrowing. *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, 808 F.3d 1, 14 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc) ("It is not our job to re-litigate or trim or expand Supreme Court decisions. Our job is to follow them as closely and carefully and dispassionately as we can."). *Amchem* gave clear direction applicable to any class certification proceeding, even stating that it was "of overriding importance" for courts to be "mindful that the Rule as now composed sets the requirements they are bound to enforce." 521 U.S. at 620.

Second, the majority justifies the district court's failure to identify the applicable law on the ground that as a general rule, predominance is "readily met" in cases alleging consumer fraud. Maj. at 37. But we have previously rejected that very conclusion, holding there are material differences between consumer protection laws in California and other states. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012). As we have explained, "the California laws at issue here have no scienter requirement, whereas many other states' consumer protection statutes do require scienter. . . . California also requires named class plaintiffs to demonstrate reliance, while some other states' consumer protection statutes do not." *Id.*

Finally, the majority contends that a court need not consider which state laws apply unless an objector raises this issue. Maj. at 44. The majority states that because "no

objector presented the correct choice-of-law analysis or explained how, under the facts of this case, the governmental interest test's three elements were met," therefore the district court was not "obligated to address choice-of-law issues, and we will not decertify a class action for lack of such analysis." Maj. at 44.

This argument is clearly not supportable. First, a district court has an independent obligation to determine what law applies before certifying a class. *See Gen. Tel. Co. of Sw.*, 457 U.S. at 160–61. Given that the district court here had reviewed Hyundai's submission regarding the multiple material differences in the laws of fifty states in the *Espinosa* action and concluded that the prerequisites of Rule 23 were not met for a litigation class, the court had an ample basis for undertaking a choice of law inquiry and determining whether it could certify a nationwide settlement class.[2]

But even if a court did not have an obligation to consider this issue sua sponte, the Virginia plaintiffs expressly raised substantial objections to the application of California law to the district court. Assuming California choice of law rules apply to the Virginia plaintiffs' claims,[3] the court was obliged

---

[2] The majority objects to the unremarkable observation that a court should apply the applicable substantive law to the case before it, claiming that such a rule might require a court to consider variations in the laws of multiple states. Maj. at 44–45 n.6. Such an analysis is generally provided by the parties, however; in this case, for instance, Hyundai gave the court a 50-state survey of potentially applicable law. *See also Mazza*, 666 F.3d at 591.

[3] Where a lawsuit is consolidated and transferred under the MDL statute, *see* 28 U.S.C. § 1407, courts generally apply the choice of law rules of each of the transferor courts, *see Phelps v. Cont'l Ill. Nat'l Bank*

to consider their objection to the application of California law under California choice of law rules before certifying the class.

The Virginia plaintiffs invoked two California choice of law rules. First, California generally enforces a contractual choice of law provision, so long as the chosen state bears "a substantial relationship to the parties or the transaction, or [] a reasonable basis otherwise exists for the choice of law." *Wash. Mut. Bank, F.A. v. Superior Court*, 24 Cal. 4th 906, 916 (2001). The burden then falls on the opponent of the choice of law provision to show "both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue." *Id.*

Here, the Virginia plaintiffs expressly asked the district court to give them the benefit of the choice of law provision in their sales contracts, which provides that "[t]he terms and conditions of this buyers order . . . and any Sale/Lease hereunder will be governed by the laws of the commonwealth of Virginia." Their argument was more than colorable: Virginia law bears a substantial relationship to the purchase of cars in Virginia, and the defendants did not show that the applicable Virginia law is contrary to a fundamental policy of California or that California has a materially greater interest

---

*& Trust Co. of Chi. (In re Nucorp Energy Sec. Litig.*), 772 F.2d 1486, 1492 (9th Cir. 1985) ("In this case, however, we must apply the choice of law rules of Illinois because the claims were originally filed in district court in Illinois before they were transferred to California by the Judicial Panel on Multidistrict Litigation."). The district court did not address the question whether Virginia choice of law rules, rather than California choice of law rules, should apply.

in its law's application in this case.**[4]**  Moreover, California courts would interpret the broad language in the contract to signify the intent that all disputes arising out of the transaction should be governed by Virginia law.   The California Supreme Court has held that "[w]hen a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended the law to apply to *all* disputes arising out of the transaction or relationship." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 469 (1992); *see also Wash. Mut. Bank*, 24 Cal. 4th at 918 ("[W]e conclude *Nedlloyd*'s analysis is properly applied in the context of consumer adhesion contracts."). Likewise, "[t]he phrase 'governed by' is a broad one signifying a relationship of absolute direction, control, and restraint," and can be read to indicate parties' intent that the transaction "be completely and absolutely controlled" by the law of the chosen forum.   *Nedlloyd*, 3 Cal. 4th at 469.**[5]**

---

**[4]** The majority asserts that the district court did not have to apply the sales contracts' choice of law provisions because California's consumer protection statutes are more protective than Virginia's.  Maj. at 43 n.5. But the majority fails to cite any case holding that California has a materially greater interest than Virginia in claims brought by Virginia residents arising out of car sales to Virginia residents in Virginia.  *Cf. Mazza*, 666 F.3d at 594 (holding that it is not necessary to apply "California law to the claims of foreign residents concerning acts that took place in other states where cars were purchased or leased" in order to further California's interest in regulating activities within California).

**[5]** The majority's assertion that the choice of law provisions at issue are not broad enough to govern this suit, Maj. at 43 n.5, is therefore incorrect.  In any event, the district court should have determined the scope of the contractual choice of law provision in the first instance; the majority's attempt to brush aside this issue on appeal merely highlights the

Accordingly, the district court could not avoid considering whether Virginia law applied and prevented it from certifying a nationwide class that included Virginia plaintiffs. Instead, the district court did not address the issue at all.

Second, the Virginia plaintiffs argued that Virginia law applied under California's governmental interest analysis. Under that rule, California law applies unless the proponent of foreign law can show that (1) the foreign law "materially differs from the law of California," (2) each state has an interest in having its law applied to the claims, and (3) the foreign state would suffer more than California if its law were not applied to the claims. *Wash. Mut. Bank*, 24 Cal. 4th at 919–20.

The Virginia plaintiffs identified material differences between Virginia and California consumer protection law.[6] In particular, the applicable Virginia consumer protection statute guarantees a minimum of $500 in damages, *see* Va. Code Ann. § 59.1-204(A), while the applicable California statute provides for actual damages, without a statutory minimum, *see* Cal. Civ. Code § 1780(a). Moreover, the Virginia statute allows for treble damages if the defendant's

district court's error in ignoring the Virginia plaintiffs' choice of law arguments. *See Wash. Mut. Bank*, 24 Cal. 4th at 916 ("[T]he trial court should first examine the choice-of-law clause and ascertain whether the advocate of the clause has met its burden of establishing that the various claims of putative class members fall within its scope.").

[6] The majority concedes that California and Virginia law differ materially. Maj. at 43 n.5. Indeed, the majority argues that the laws of the two states are so different that California courts would refuse to apply Virginia law, even where the parties contracted for such application. Maj. at 43 n.5.

conduct was "willful," Va. Code Ann. § 59.1-204(A), while the applicable California statute allows for punitive damages where it is proved by "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice," Cal. Civ. Code § 3294(a). Virginia plaintiffs argued that they would be able to show the defendants had been willful, even if the California plaintiffs could not show "that the defendant has been guilty of oppression, fraud, or malice." Given the plaintiffs' argument that they were entitled to the application of Virginia law, the district court could not escape its minimum obligation to determine what law applied before certifying a class that included the Virginia plaintiffs.

The majority dismisses this argument on the ground that the district court could "'properly find California law applicable without proceeding' to the rest of the analysis." Maj. at 44 (quoting *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 995 (9th Cir. 2010)). But the district court did not make any such finding; it merely noted that "to the extent that small differences in state laws exist, or if substantial differences in state law are brought to light at the final fairness hearing, those issues do not prevent the Court from certifying the class for settlement purposes." The court's failure to discharge its clear obligation in light of the Virginia plaintiffs' objection is reversible error.

In sum, the district court's failure to determine the applicable law meant it failed to fulfill its independent obligation to "conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (internal quotation marks omitted). For this reason, the district court could not

properly certify the class.   The majority errs in holding otherwise.[7]

## IV

The majority also errs in upholding the district court's award of attorneys' fees.  In the class action context, a district court has "an independent obligation to ensure that the award [of attorneys' fees], like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).   When the court fails to provide an adequate explanation of whether the award is proportionate to the benefit obtained for the class, "we have no choice but to remand the case to the district court to permit it to make the necessary calculations and provide the necessary explanations." *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009).

Here, the district court failed to make a reasonable effort to determine the value of the settlement, instead relying on a speculative estimate provided by the settling parties during

---

[7] The majority also runs afoul of *Amchem* by ignoring the differences between new and used car owners. Maj. at 40–41.  Unlike the new car owners, the used car purchasers did not view the Monroney stickers.  Nor did Hyundai and Kia engage in a pervasive advertising campaign that raised "little doubt that almost every class member had been exposed to defendants' misleading statements," so a court cannot presume that used car owners relied on misleading advertising. *Mazza*, 666 F.3d at 596. Such a significant factual difference gives rise to a significant legal difference regarding the viability of used car owners' claims, which defeats predominance. *See Amchem*, 521 U.S. at 624.  The majority errs in glossing over this issue with vague references to "trial management issues." Maj. at 40.

the preliminary approval process, which valued the proposed settlement at $210,000,000. When relying on this unsupported figure, the district court noted that it expected "an update from the Settling Plaintiffs and defendants as to the amount of settlement funds which class members have in fact claimed." But the district court never got this update,[8] nor did it take any other steps to determine the benefits provided by the settlement. Because the district court failed to take a careful look at the claims data, it could not consider the evidence indicating that the amount of settlement funds claimed by class members who were not already part of the

---

[8] The majority's assertion that the district court received an update on the value of the settlement at the final fairness hearing on June 11, 2015, Maj. at 62 n.13, is unsupported by the record. At that hearing, the district court and defense counsel engaged in the following colloquy:

> The Court: I guess I have a discussion of the numbers of class members who have agreed to the settlement in terms of electing to participate in it. . . . And I indicated what the figures that I have now are for those levels of participation. I presume everybody agrees that those numbers are the numbers.

> [Hyundai's Counsel]: Our calculations were actually slightly different but not in a material way.

Whatever this ambiguous colloquy meant to the court and the parties regarding the amount of settlement funds claimed by class members as of the date of the hearing, it does not constitute a reasonable judicial effort to determine the value of the settlement. The majority's observation that "participation rates are a mathematical predicate to valuing this settlement," Maj. at 62 n.13, highlights the problem: when a court has an obligation to calculate *the value* of the settlement, it is per se unreasonable to stop after identifying *one predicate* to the calculation of that value.

reimbursement program was an order of magnitude less than $210,000,000.**⁹**

Because the district court failed to reasonably estimate the value of the settlement, despite the objectors' cogent arguments that this value was relatively small, the district court did not have the information necessary for determining whether the attorneys' fees awards were proportionate to the benefit obtained for the class. Accordingly, the district court failed to assure "that the amount awarded was not unreasonably excessive in light of the results achieved." *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 943.

In concluding that the district court's award of attorneys' fees was reasonable, the majority likewise skips over this crucial step. Rather, the majority's analysis is based on an assumption that the settlement provided a significant benefit to the class. For example, the majority argues that the class counsel did not "receive a disproportionate distribution of the settlement." Maj. at 57 (quoting *Bluetooth Headset Prods.*

---

**⁹** While the majority cites expert reports to support the initial settlement value estimate, it is not clear the district court was even aware of these reports; it did not discuss or address them, and certainly did not subject them to any rigorous examination. Maj. at 62 n.13. The majority misleadingly speculates that the district court "did not discuss the reports *in detail*" because they were filed under seal. Maj. at 62 n.13 (emphasis added). Of course, the district court did not discuss the reports *at all*, and there is no basis whatsoever for the majority's speculation. Had the court critically analyzed the reports, their questionable assumptions may have undermined their reliability. For example, the reports assumed that car owners who entered the lifetime reimbursement program after the settlement would own their cars for a longer period of time than car owners who entered the lifetime reimbursement program before the settlement; this assumption has no reasonable basis and inflates the perceived value of the settlement.

*Liab. Litig.*, 654 F.3d at 947).   Because the value of the settlement is undetermined, this conclusion lacks any reasonable foundation.   Similarly, the majority argues that "the district court properly exercised its discretion in calculating the fee award using the lodestar method" because it found that the attorneys' fees award was lower than 25 percent of the settlement amount.   Maj. at 60–61.   But lacking any considered estimate of the settlement's value, neither the district court nor the majority can reliably compare the fee award to the settlement figure in this case. The difference between the parties' unsupported estimation of settlement value and the objectors' calculation is critical in this context.   If the settlement had conferred $210,000,000 in value, as the parties originally speculated, a $9,000,000 total fee award might have been justified; but a court would be hard-pressed to justify such a fee award if the value conferred on the class were closer to $21,000,000, as the objectors contend.   Even when it is "difficult to estimate the settlement value's upper bound," Maj. at 60–61, there is no excuse for the district court's failure to calculate a reasonable estimate after reviewing the facts and the parties' arguments.

The district court likewise provided insufficient reasoning for its application of multipliers to the lodestar amounts used to calculate various counsels' fee awards.   The application of a multiplier is appropriate only in "rare" or "exceptional" cases.   *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).   Foremost among the factors that may justify a positive (or negative) multiplier is "the benefit obtained for the class."   *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 942.   Without determining what value the settlement provided to class members, the district court could not determine whether this was such a rare or exceptional case that justifies a positive multiplier.   *Perdue*, 559 U.S. at 554.

Moreover, the district court failed to resolve the objectors' claim that the settlement provided minimal value beyond the reimbursement voluntarily offered by Hyundai and Kia.[10]

Nor did the district court resolve the objectors' argument that class counsel did little beneficial work on the case. The settlement of the case was announced in February 2013, only three months after Hyundai and Kia announced their voluntary reimbursement program. This settlement was followed only by "confirmatory discovery," a procedure the parties agreed to use in lieu of actual discovery under the federal rules. According to the objectors, Hyundai and Kia retained significant control of this confirmatory procedure, including by selecting the witnesses who would be interviewed (rather than deposed) by class counsel. There is no dispute that the confirmatory discovery process added little or no value to the settlement. Yet the district court offered no explanation for why fees incurred for confirmatory discovery warranted a multiplier.

If the settlement and counsel's confirmatory review of the documents and witnesses produced by the defendants provided only minimal benefit to the class, the district court's

---

[10] According to the majority, the district court was justified in including the entire value of the lifetime reimbursement program—which defendants offered before they entered the settlement—because "the settlement extended the time for enrollment and provided additional compensation to Reimbursement Program enrollees." Maj. at 62 n.13. But it is not reasonable to calculate the value of a settlement as including the full value of a program that preexisted the settlement. The district court reasonably could have calculated the marginal value adduced from the extended enrollment time and additional compensation, but attributing the pre-settlement value of the program to the settlement is not reasonably defensible.

rationale for awarding multiplied fees—the "complexity and volume of work" and the degree of risk assumed by *Espinosa* counsel—is baseless.

The majority affirms the district court's use of the multipliers despite these failures, again based on the flawed assumption that the degree of benefit to the class was known and that we have affirmed comparable multipliers in other cases. Maj. at 63 (citing *Viscaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002); *Kelly v. Wengler*, 822 F.3d 1085, 1093, 1105 (9th Cir. 2016)). But this is beside the point. The law requires a district court to provide an adequate explanation of the award. The majority's repetition of the district court's explanation does not improve it. Accordingly, I would remand the attorneys' fee award to the district court so that it could reevaluate the fee award after calculating the value of the settlement and provide adequate reasoning for the applied multipliers.

V

Our court, like many others, leans toward approving class certifications and class settlements, which benefit both defendants (who are relieved of significant liability in a single stroke) and class counsel (who are amply rewarded for their efforts). Nevertheless, despite any such judicial inclinations, we remain bound by *Amchem*'s clear direction that courts must be rigorous in ensuring that a class meets the prerequisites of Rule 23(b). The prospect of settlement may mitigate management concerns, but it does not relieve a court of this responsibility. By failing to determine what law applied to the nationwide class of plaintiffs in this case, the district court could not fulfill this basic obligation. And by failing to make a reasonable determination of the value of the

settlement, the court lacked the ability to make a proportional attorneys' fee award.  The majority's failure to correct these errors may be beneficial for the class action bar, but it detracts from compliance with Supreme Court precedent. Therefore, I dissent.